# Illinois Official Reports

## Appellate Court

---

**In re Marriage of Benink, 2018 IL App (2d) 170175**

---

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF SUZETTE L. BENINK, Petitioner-Appellee and Cross-Appellant, and ERIC H. BENINK, Respondent-Appellant and Cross-Appellee. |
| District & No. | Second District<br>Docket No. 2-17-0175 |
| Filed<br>Supplemental opinion upon denial of rehearing | February 2, 2018<br><br>March 13, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Winnebago County, No. 10-D-27; the Hon. Steven L. Nordquist, Judge, presiding. |
| Judgment | Affirmed as modified in part, reversed in part, and vacated in part. Cause remanded. |
| Counsel on Appeal | Jody L. Booher and Laura A. Baluch, of Barrick, Switzer, Long, Balsley & Van Evera, LLP, of Rockford, for appellant.<br><br>D. Kevin Sommer, of Rockford, for appellee. |

Panel
JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.

Justices Jorgensen and Spence concurred in the judgment and opinion.

## OPINION

¶ 1    In this appeal and cross-appeal, the parties dispute the amount of modified child support owed by the respondent, Eric Benink, to the petitioner, Suzette Benink; the law to be applied to that calculation; and whether Eric presented a valid reason for his noncompliance with the judgment of dissolution.

¶ 2                                  I. BACKGROUND

¶ 3    Suzette and Eric were married in 1991 and had four children together. They divorced in 2010. Eric was employed by OSF St. Anthony Hospital as vice president and chief medical officer. Suzette did not work outside the home during the marriage.

¶ 4    Under the judgment of dissolution, the parties shared joint custody of the children, with Suzette as the residential parent. A property settlement agreement incorporated into the judgment contained the following child support provisions relevant here:

"2. Husband shall pay to Wife a base sum of $2,431.00 bi-weekly for the support *** of the minor children of the parties, so long as each child is alive, unmarried and under the age of majority, except that if any child is in the process of completing his or her high school education in the year the child reaches the age of majority, Husband shall continue to make support payments through the end of the academic year.

3. In addition, Husband shall pay to Wife as child support, 40% of any additional money he shall earn as a bonus, commission, performance pay, incentive pay or the like. The amount to be paid shall be calculated as defined by the Illinois 'minimum guideline statute', 750 ILCS 5/505. This additional child support shall be paid to Wife within 5 days after receipt by Husband, and shall be accompanied by a copy of the check and the check stub and a copy of the calculations made in determining the amount so paid. In the event that the parties cannot thereafter agree on the accuracy of the payment, it shall be referred to the Court for determination."

The property settlement agreement further required Eric to provide to Suzette, by April 15 of each year, a sworn statement of his income and copies of his W-2 forms from the previous year. Suzette was to receive $72,000 per year in maintenance from Eric.

¶ 5    In May 2012, the parties' oldest child (who was by then 18 years old) graduated from high school. Eric continued to pay the base $2,431 in biweekly child support.

¶ 6    In November 2012, Eric was offered employment with Northwest Community Hospital at a base salary of $420,000 per year plus a 25% performance bonus. In accepting the position, Eric sought an additional $30,000 signing bonus. He testified that he sought the signing bonus because he planned to sell his home in Belvidere and move to Algonquin and he anticipated that he would lose about that amount on the sale of his Belvidere home. Northwest Community Hospital agreed to pay him "a one-time signing bonus, to include moving expenses, of $30,000." Eric received the signing bonus in 2012. He did not disclose to Suzette that he had

received the signing bonus or that in 2012 he had earned an additional $6616.67 from other sources for consulting work. Eric testified that he ultimately lost about $31,486 on the sale of his Belvidere home. His 2013 tax return listed $1994 in "moving expenses," which were incurred in the summer of 2013.

¶ 7     Eric remained employed by OSF St. Anthony through the end of 2012. His base salary through September 30, 2012, was $334,086. On December 10, 2012, Eric was notified that his 2012 bonus would be $51,783.33. On December 31, 2012, Eric paid Suzette $9694. In an email, he told her that this amount represented 32% of his net bonus of $30,293, indicating that he had unilaterally reduced the percentage being paid as child support because of the oldest child's graduation.

¶ 8     In February 2013, Suzette filed a multi-part petition seeking (1) modification of the amount of child support, based on her belief that Eric was now earning substantially more than at the time of dissolution, (2) a finding of contempt against Eric for his failure to comply with the judgment of dissolution, in that he had not paid her 40% of his net 2012 OSF St. Anthony bonus and had not provided her with any documentation of his income since the dissolution, and (3) educational expenses for the children. In the portion seeking a finding of contempt, Suzette also stated that she believed that Eric had received a signing bonus in connection with his new position at Northwest Community Hospital but had not reported any additional income to her. She sought payment of all amounts due her and attorney fees.

¶ 9     The trial court issued a rule to show cause. In March 2013, Eric filed his own petition for a rule to show cause, asserting that Suzette had interfered with his visitation. In the petition, Eric also sought to reduce his child support obligation, on the basis that some of the children were no longer minors. Around the same time, Eric paid Suzette the difference between the previously paid 32% of his OSF St. Anthony bonus and the 40% that Suzette asserted was due under the judgment of dissolution.

¶ 10    In May 2014, the parties' second child, who was 18 years old, graduated from high school. The parties' third child did likewise in May 2016.

¶ 11    For reasons that are unclear to us, the hearing on the two petitions did not commence until February 2016, almost three years after they were filed. The parties had settled the issue of educational expenses in the meantime, but the issues of the proper amount of child support and the parties' alleged noncompliance with the dissolution judgment remained pending. A second day of the hearing on these issues took place in June 2016. On June 24, 2016, the trial court entered an interim order for child support in the amount of $1664 biweekly, which was 20% (the statutory percentage for one child) of Eric's base salary, net of all statutory deductions (including maintenance) allowed under the most recent version of section 505 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/505 (West 2016)).

¶ 12    In August 2016, the trial court issued a memorandum decision. The trial court first addressed the issue of which version of the Act applied. It noted that, while the petitions were pending, the General Assembly had enacted Public Act 99-90 (new Act), a comprehensive revision of the Act, with an effective date of January 1, 2016. That enactment contained, among other things, a provision adopting and adding to section 801 of the existing Act (750 ILCS 5/801 (West 2014)). The provision stated that the new Act applied to (1) new proceedings commenced after January 1, 2016, (2) "pending actions and proceedings commenced prior to [January 1, 2016,] with respect to issues on which a judgment has not been entered," and (3) proceedings commenced after January 1, 2016, that sought "the modification

of a judgment or order entered prior to" that date. The trial court characterized the petitions as pending proceedings raising issues on which a judgment had not been entered, and it declared that it would therefore apply the new Act.

¶ 13   The trial court then addressed the requests for modification of Eric's child support obligation. Construing the language of the parties' property settlement agreement, the trial court stated that, although the agreement provided that Eric's child support obligation continued only so long as each child was below age 18 or still in high school, it did not expressly provide for a recalculation of child support each year or upon a child's graduation from high school. In the absence of such a provision, the trial court stated that it would perform a "look back" to determine the proper amount of child support due over time, but it would modify the child support obligation only if the amount due during any given period was a substantial change from the amount due in the prior period. The trial court announced that it would apply a "threshold *** of 20% or more of an increase or decrease" before granting any modification.

¶ 14   As to 2012, Suzette's petition sought only to enforce Eric's obligation to pay 40% of any bonus he received. The trial court held that, as Eric had eventually paid 40% of his OSF St. Anthony bonus, no further amounts were due and owing for 2012. The trial court did not address the signing bonus Eric received from Northwest Community Hospital.

¶ 15   For 2013, the trial court agreed with Suzette's calculation that Eric's net income was $378,397, which represented a substantial increase from the net income suggested by his prior child support obligation of $2431 biweekly. Accordingly, the trial court granted Suzette's petition to modify Eric's child support obligation, setting it at $10,090.59 per month (32% of Eric's net income, based on there having been three minor children during all of 2013).

¶ 16   The trial court found that Eric's 2014 net income was $448,097. As the second-oldest child graduated at the end of May, child support would be 32% of net income ($11,949.25 per month) for five months, and then 28% ($10,455.60 per month) for the remaining seven months. However, as neither of these amounts was at least 20% above the previous child support obligation of $10,090.59 per month, the trial court denied further modification and continued the $10,090.59 monthly obligation throughout 2014.

¶ 17   As to 2015, the trial court found that Eric's net income was $355,062. The amount of child support would be $8,274.78 per month (28% of net income based on two minor children during the entire year). However, as this was not at least 20% less than the prior child support obligation, the trial court again declined to modify and kept Eric's child support obligation at $10,090.59 per month.

¶ 18   The trial court did not make any explicit finding of Eric's net income in 2016. However, the interim child support order entered in June 2016 reflected the graduation of the parties' third child. Assuming that the $1664 biweekly obligation imposed in that order was based on one minor child, that would equate to a net income of $216,320 per year. (That amount reflected a deduction of the $72,000 in maintenance paid by Eric, meaning that Eric's total net income was $288,320.) Although this new child support amount represented a decrease of more than 20%, the trial court continued Eric's prior support obligation of $10,090.59 per month through the end of May 2016, when the third child graduated. The trial court held that the proper amount of child support going forward from June 2016 would be $1664 biweekly. Further, the trial court modified the property settlement agreement to provide that, until the last

child's graduation from high school, Eric would owe the statutory rate of 20% (rather than 40%) of any additional money earned beyond his base salary.

¶ 19    Taking all of the above findings into account, the trial court found that Eric owed $146,435.46 in child support for 2013 through June 2016. The trial court ordered Eric to make three payments of $50,000 each over a six-month period, saying that the extra $3564.56 represented interest on the amount due.

¶ 20    As to Suzette's petition for a finding of contempt against Eric based on his failure to timely provide her with financial records and to pay her 40% of the additional money he earned, the trial court found that Eric had complied with both of these obligations, "once he was reminded" of them, and that his failure to comply earlier was not willful and contumacious. Accordingly, the trial court denied the petition and the relief sought by Suzette. The trial court likewise denied Eric's petition for a rule to show cause, finding that he had not proven that Suzette willfully and contumaciously disobeyed the visitation provisions in the dissolution judgment, which required only undefined "reasonable and seasonable" visitation.

¶ 21    Finally, after ordering Eric to produce his financial documents without Suzette having to request it, the trial court denied any other pending requests for modification of the dissolution judgment or other relief. These included Suzette's request for attorney fees. In denying this request, the trial court noted that its calculation of Eric's child support arrearage was higher than Suzette's calculation (by about $20,000). The trial court stated that its higher calculation of the child support arrearage was, "in essence, a contribution toward [Suzette's] fees." The trial court ordered Suzette's attorney to prepare a further written order consistent with its decision. That order was entered on October 4, 2016.

¶ 22    Both parties filed motions for reconsideration. Eric's motion argued that the trial court should have deducted the amount of Suzette's maintenance from his net income every year since 2013 and that the trial court erred in repeatedly applying a 20% threshold for granting any child support modification. Suzette's motion argued that (1) the trial court had failed to address the $30,000 signing bonus and the $6616 in consulting fees that Eric received in 2012, (2) the trial court had undercounted Eric's 2016 income by about $6000 and so the June 2016 child support order should be adjusted, (3) the trial court should not have applied the new Act, because it represented a substantive change in the law that would attach detrimental consequences to events completed before its effective date, (4) if the trial court appropriately used the formula in the new Act, then it abused its discretion in barring Suzette from presenting evidence regarding the lifestyle enjoyed by Eric and the needs of her household and the remaining minor child, as would be necessary to support a deviation from the statutory child support guidelines, and (5) if the trial court granted part of Eric's motion to reconsider, it should also reconsider its denial of attorney fees for Suzette. The trial court denied both motions. Eric then filed this appeal, and Suzette filed a cross-appeal.

¶ 23                                II. ANALYSIS
¶ 24                                A. The Appeal
¶ 25    Eric raises two main arguments in his appeal. First, he argues that, despite the trial court's statement that it was applying the new Act, it did not actually do so, failing to deduct maintenance from his net income in 2013, 2014, and 2015. Second, he argues that the trial court erred in repeatedly applying a 20% threshold to any modification of child support requested by the parties.

¶ 26    We begin by considering the proper law to be applied in these child-support-modification proceedings. Section 801 of the new Act governs this issue, so we must construe that statute. In construing a statute, our task is to "ascertain and give effect to the legislature's intent." *Lieb v. Judges' Retirement System*, 314 Ill. App. 3d 87, 92 (2000). The best indicator of the legislature's intent is the plain language of the statute. *Lee v. John Deere Insurance Co.*, 208 Ill. 2d 38, 43 (2003). "When the statute's language is clear, it will be given effect without resort to other aids of statutory construction." *Id*. We review *de novo* a trial court's ruling on an issue of statutory construction. *Evanston Insurance Co. v. Riseborough*, 2014 IL 114271, ¶ 13.

¶ 27    The new Act is a comprehensive reworking of the Act and contains, among other things, a provision adopting and amending section 801 of the Act. That section provides as follows regarding the new Act's applicability:

"(a) This Act applies to all proceedings commenced on or after its effective date.

(b) This Act applies to all pending actions and proceedings commenced prior to its effective date with respect to issues on which a judgment has not been entered. ***

(c) This Act applies to all proceedings commenced after its effective date for the modification of a judgment or order entered prior to the effective date of this Act." 750 ILCS 5/801 (West 2016).

Under this provision, the new Act applies to wholly new dissolution proceedings and to modification proceedings filed after January 1, 2016. 750 ILCS 5/801(a), (c) (West 2016). It also applies to pending proceedings (*i.e.*, proceedings filed before that date), but only as to issues on which no judgment exists. *Id.* § 801(b).

¶ 28    The trial court believed that the parties' petitions seeking modification of Eric's child support obligation, which were pending on the effective date of the new Act, fell within subsection (b). However, this reading is contrary to the plain language of the statute. Eric's child support obligation was not, in the words of subsection (b), an "issue[ ] on which judgment ha[d] not been entered." The 2010 judgment of dissolution incorporated the parties' property settlement agreement, which contained provisions establishing Eric's child support obligation. Thus, a judgment *had* been entered on the issue of child support.

¶ 29    Rather, the parties' petitions sought the modification of a prior judgment (the judgment of dissolution). As such, they plainly fell within subsection (c) of the statute, which governs "proceedings *** for the modification of a judgment *** entered prior to the effective date of this Act." *Id.* § 801(c). However, under subsection (c), the new Act applies only to modification proceedings commenced after January 1, 2016, the effective date of the new Act. Here, the parties filed their petitions in 2013, long before the new Act took effect. Accordingly, the new Act did not apply to the proceedings on those petitions.

¶ 30    Eric complains that, although the trial court stated that it would apply the new Act, it did not in fact subtract the amount of his maintenance payments from his 2013, 2014, and 2015 net income in calculating his child support obligation, as would be required under the new Act.[1] See *id*. § 505(a)(3)(g-5). In light of our holding that the new Act did not apply to the parties'

_____

[1]In fact, an earlier enactment, Public Act 98-961 (eff. Jan. 1, 2015), amended section 505 of the Act to allow the deduction of maintenance from net income. However, as Eric has not argued that this amendment should apply here, we need not consider its effect. See Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013) (points not argued are forfeited).

2013 petitions seeking to modify child support, we find no error in the trial court's failure to apply that law.

¶ 31    Eric also argues that the trial court erred in applying a 20% threshold for any modification of child support during the period between the filing of the modification petitions and the trial court's ruling. We agree.

¶ 32    A trial court enjoys broad discretion in determining whether to modify child support, and we will not overturn its decision unless it results from an abuse of discretion. *In re Marriage of Hill*, 2015 IL App (2d) 140345, ¶ 17. A trial court abuses its discretion when its ruling is arbitrary, fanciful, or unreasonable, no reasonable person would take the view adopted by the trial court, or its ruling rests on an error of law. *People v. Olsen*, 2015 IL App (2d) 140267, ¶ 11.

¶ 33    The 20% threshold for modification is contained in section 510(a) of the Act (750 ILCS 5/510(a) (West 2016)). (Neither party argues that there is any appreciable difference between the Act and the new Act for the purpose of this particular argument.) That section provides, in pertinent part:

> "(a) *** An order for child support may be modified as follows:
>
>> (1) upon a showing of a substantial change in circumstances; and
>>
>> (2) without the necessity of showing a substantial change in circumstances, as follows:
>>
>>> (A) upon a showing of an inconsistency of at least 20% *** between the amount of the existing order and the amount of child support that results from application of the guidelines specified in Section 505 of this Act ***.
>>>     ***
>
> The provisions of subparagraph (a)(2)(A) shall apply only in cases in which a party is receiving child support enforcement services *** under Article X of the Illinois Public Aid Code [(305 ILCS 5/10-1 *et seq.* (West 2016))] ***." 750 ILCS 5/510(a) (West 2016).

¶ 34    The trial court committed two legal errors by applying the 20% threshold repeatedly in calculating Eric's child support obligation. First, under the plain language of the statute, the 20% threshold does not apply in this case, because neither of the parties was receiving child support enforcement services under the Illinois Public Aid Code. Second, the 20% shortcut to finding a substantial change in circumstances is relevant only to the first step in modification proceedings: determining whether a modification is warranted at all. Here, once the trial court found that in 2013 there had been a substantial change, the issue of *whether* a modification should be granted was resolved, and the only matter left for its determination was the appropriate *amount* of the modified child support obligation during the period between the filing of the petitions to modify and the court's decision. See *In re Marriage of Sassano*, 337 Ill. App. 3d 186, 194 (2003) (trial court determines threshold issue of substantial change and then determines the amount of the modification). There was no legal basis for the trial court to apply the threshold repeatedly during the passage of that period. The lack of any rationale for reapplying the threshold was particularly clear given that the trial court engaged in a "look-back" over the three years since the modification petitions were filed, and thus it could (and should) have simply calculated the amount of child support due during that period once it determined that some modification was warranted.

¶ 35    As the trial court abused its discretion by making legal errors in calculating Eric's child support obligation, we vacate its decision on that issue. Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994) permits us to enter any judgment that ought to have been made, and the amount of child support owed by Eric from 2013 through May 2016 is easily determined from the record. Accordingly, we modify the amount of Eric's child support arrearage as follows. As to 2013, Eric argues only that maintenance should have been deducted from his net income, an argument that we have rejected. The trial court's determination of Eric's obligation for that year, and its calculation that he had underpaid by $32,826.34, is correct. In 2014, Eric owed $11,949.25 per month through May 2014, when the parties' second child graduated, and then $10,455.60 per month for the remainder of the year. (The trial court correctly calculated these amounts, but it then failed to apply them as it incorrectly applied the 20% threshold.) This amounts to a total of $132,935.45 as Eric's child support obligation for 2014, an amount that he underpaid by $69,728.46. As to 2015, the trial court correctly determined that the guideline amount was $79,257.36, and this is the amount Eric should have paid. As he actually paid $2568.64 more than this amount, he is entitled to a credit. Finally, assuming a net income of $288,320 in base salary in 2016 (see *supra* ¶ 18), Eric's child support obligation through May 2016, when the third child graduated, was $6727.47 per month, or a total of $33,637.35. Eric overpaid child support for this period in the amount of $347.65. Totaling all of the underpayments and overpayments, we find that Eric had an arrearage of $99,638.51 through May 2016. We therefore reduce the $150,000 figure arrived at by the trial court to $99,638.51.

¶ 36    Eric's last contention is that the trial court should not have included his $30,000 signing bonus in his net income for 2012 and should have deducted $33,480.31 from his net income for that year, because the bonus was meant to compensate him for the loss he incurred in selling his Belvidere home. As Suzette points out, however, the trial court did not in fact address the signing bonus, and there is no indication that it included the bonus in his 2012 income. Parties may appeal only rulings that are adverse to them (*Carson v. Rebhan*, 294 Ill. App. 180, 182 (1938) (a party cannot appeal an error that does not injure him)), and thus Eric cannot raise this issue in the first instance. We revisit the issue when considering Suzette's cross-appeal.

¶ 37                                B. The Cross-Appeal

¶ 38    Suzette raises several issues in her cross-appeal. As many of them relate to the trial court's denial of her petition for a finding of contempt against Eric, we begin by examining that decision.

¶ 39    In her petition, Suzette alleged that Eric had failed to comply with the judgment of dissolution in two ways: he had never provided yearly financial statements as required and he had not paid as child support the entire 40% of his OSF St. Anthony bonus. Suzette also believed that Eric had received a signing bonus from Northwest Community Hospital, but he had not provided her with any information about it (or paid any child support on it). Suzette asked the trial court to find Eric in indirect civil contempt and to provide the following relief: (1) order Eric to pay her $2500 in satisfaction of the remaining amount of child support owed on the OSF St. Anthony bonus, (2) determine the amount due as child support from the "December, 2012" bonus, (3) order Eric to pay her attorney fees, and (4) enter any other relief deemed just.

¶ 40    As noted above, the judgment of dissolution required Eric (1) by April 15 of each year to provide Suzette with financial statements and copies of his W-2 forms showing his income

- 8 -

from the previous year and (2) to pay as child support "40% of any additional money he shall earn as a bonus, commission, performance pay, incentive pay or the like." At the hearing on the petitions, Eric admitted that, since the entry of the judgment of dissolution, he had never provided his W-2 forms or other financial statements to Suzette. He first provided his W-2 forms and statements for 2010 and 2011 to her in March 2013, after she had filed the petition with the request to have him held in contempt. He testified that his failure to comply with the judgment of dissolution was not intentional and that he would have provided the information if Suzette had asked, but she did not ask and he did not provide them because he had a "busy life."

¶ 41    As for his failure to pay Suzette 40% of his OSF St. Anthony bonus, he testified that he paid her only 32% because their oldest child had graduated from high school and so he believed that he could reduce the percentage he paid. However, he also testified that he understood that, until a judge changed a court order, he was required to obey the order. Suzette testified that, when she told Eric that the dissolution judgment required him to pay 40% until he went to court to have the judgment modified, he sent her an email stating that he would pay her no more than 32% and he marked the check he sent her "paid in full." As with the financial statements, he did not comply and pay her the difference he owed until March 2013, after she had filed the petition. Finally, Eric stated that he was not required to pay Suzette 40% of his signing bonus from Northwest Community Hospital or the additional $6616 he earned from consulting in 2012, because he did not view either of them as "additional income" on which he was required to pay child support under the judgment of dissolution.

¶ 42    Suzette argues that, given all of this evidence, the trial court abused its discretion in finding that Eric's noncompliance with the terms of the dissolution judgment was not willful or contumacious.

¶ 43    Civil contempt occurs when a party willfully fails to comply with a court order. *In re Marriage of Knoll*, 2016 IL App (1st) 152494, ¶ 50. The noncompliance is classified as indirect civil contempt when it occurs outside the presence of the court. *Id*. "The burden initially falls on the petitioner to establish, by a preponderance of the evidence, that the alleged contemnor has violated a court order. [Citation.] Once that burden is satisfied, the burden shifts to the contemnor, who has the burden of showing that the violation was not willful and contumacious and that he or she had a valid excuse for failing to follow the order." *Id*. "Whether a party is guilty of contempt is a question of fact for the trial court, and a reviewing court should not disturb the trial court's determination unless it is against the manifest weight of the evidence or the record reflects an abuse of discretion." *In re Marriage of McCormick*, 2013 IL App (2d) 120100, ¶ 17. A decision is against the manifest weight of the evidence when the opposite conclusion is clearly evident or when the court's findings are unreasonable, arbitrary, and not based on any of the evidence. *Samour, Inc. v. Board of Election Commissioners*, 224 Ill. 2d 530, 544 (2007). Similarly, as noted, an abuse of discretion occurs only when the ruling is arbitrary, fanciful, or unreasonable; when no reasonable person would take the view adopted by the trial court; or when the ruling rests on an error of law. *Olsen*, 2015 IL App (2d) 140267, ¶ 11. Suzette thus faces a daunting task in demonstrating that the trial court's ruling should be reversed. Nevertheless, we believe that she has met that burden, for the following reasons.

¶ 44    As to his failure to provide financial statements and pay the full amount of child support due on his OSF St. Anthony bonus, Eric did not dispute that he violated the terms of the

dissolution judgment. Thus, Suzette met the requirement to prove noncompliance and the burden shifted to Eric to show, by a preponderance of the evidence, that he had a valid excuse for that noncompliance. This Eric did not do.

¶ 45    Eric suggested that he simply forgot to provide the documentation and that Suzette should have reminded him, and he stated that he took it upon himself to reduce his child support obligation on the bonus, because one child had graduated from high school. Neither of these assertions provided the necessary "valid excuse" for noncompliance.

¶ 46    Eric attempted to blame Suzette for his failure to provide the documentation, but this was clearly improper. As Eric admitted, he knew that he was obliged to obey the terms of the judgment of dissolution. He simply did not do so, a fact not justified by his "busy life" or Suzette's failure to remind him of his obligations. The trial court accepted this excuse, finding that Eric's noncompliance was not deliberate or contumacious and noting that he eventually produced the documentation, once Suzette filed her petition to find Eric in contempt. However, this "no harm, no foul" approach failed to adequately consider the costs of Eric's noncompliance. By failing to provide Suzette with yearly financial statements, Eric likely was able to substantially underpay child support prior to 2013. Moreover, Eric's noncompliance required Suzette to expend funds for attorney fees she would not otherwise have incurred.

¶ 47    The dissolution judgment required Eric to pay child support of $2431 biweekly, or $63,206 per year. Given the statutory guideline for four children, which requires an obligor to pay 40% of his or her net income, this level of child support implies that Eric's net income in 2010 was $158,015. By contrast, the trial court found that Eric's net income in 2013 was $378,397—*more than double* his net income at the time of the dissolution judgment. If Eric had provided Suzette with financial statements in 2011 and 2012, it is highly likely that it would have shown that his net income had increased substantially, justifying an increase in his child support obligation. Thus, Eric's noncompliance was extremely beneficial to him. The trial court's failure to take this substantial financial motivation into account was arbitrary and unreasonable, and was an abuse of discretion.

¶ 48    Similarly, the trial court abused its discretion in accepting at face value Eric's testimony that he believed that he was entitled to unilaterally reduce the percentage of the OSF St. Anthony bonus that he paid, because one child had graduated from high school. Eric admitted that he knew that he was required to obey any court order until it was modified. Moreover, we note that, if Eric had truly believed that he could unilaterally reduce his child support obligation once one child had graduated, logically he would also have reduced his "base" child support payments beginning in June 2012. He did not do so, however—perhaps because doing so would have caused Suzette to raise the matter in court, precipitating a review of Eric's finances that might have revealed that his income had doubled. Even without going so far as to draw this inference, however, it is plain that Eric's failure to pay the full 40% of his OSF St. Anthony bonus was both deliberate and unexcused. The trial court's refusal to find that this constituted contempt was contrary to the manifest weight of the evidence.

¶ 49    Finally, the trial court also erred in failing to grant the relief Suzette sought with respect to the signing bonus. Eric first argues that Suzette forfeited this relief because she did not explicitly refer to the signing bonus in her prayer for relief: instead she requested that the trial court determine the proper amount of child support Eric should pay on the "December 2012" bonus. Eric argues that this was insufficient to constitute a request for child support on the signing bonus because, as he testified, he received the signing bonus in November 2012, and

the OSF St. Anthony bonus was the only one he received in December 2012. But Eric had not given Suzette any information about the signing bonus by the time she filed her petition and she had no way of knowing the schedule of Eric's bonus payments. Further, at the hearing she adduced evidence regarding the signing bonus as well as the additional $6616 Eric received as consulting fees, and her closing argument included a request that Eric be ordered to pay as child support 40% of the net of those amounts. Thus, this request was clearly a matter before the trial court for consideration. We decline to hold that Suzette forfeited this request merely because the prayer for relief in her petition did not include the phrase "signing bonus."

¶ 50    Eric next argues that the trial court properly declined to hold him in contempt for failing to pay child support on the $36,616 in undisclosed additional income for 2012 (the signing bonus and the consulting fees), because he did not view that income as "bonuses" in the "true sense of the word." However, the dissolution judgment required Eric to pay 40% of "any additional money he shall earn as a bonus, commission, performance pay, incentive pay or the like." When considered in connection with the provision requiring biweekly payments of child support in an amount calculated with respect to his base salary, this terminology reflects the parties' intent that Eric make prompt payments of 40% of any additional income he received. And, of course, section 505 of the Act clearly defines "income" for child support purposes as including income from all sources. 750 ILCS 5/505(a)(3) (West 2016).

¶ 51    Eric argues that the loss of value he realized on the sale of his home (an asset) should be deducted from his net income for child support purposes, as an "[e]xpenditure[ ] for repayment of debts that represent[s] reasonable and necessary expenses for the production of income" (see 750 ILCS 5/505(a)(3)(h) (West 2016)). But a loss in an asset's value is not the same as an expenditure, and this argument lacks both logic and any legal support. More importantly, there is no indication that the trial court "declined" to find Eric in contempt for failing to pay child support on his additional 2012 income. Instead, the trial court simply neglected to address that income at all. Inasmuch as Suzette had requested relief on this issue, the trial court's failure to address it was an abuse of discretion.

¶ 52    For all of these reasons, we conclude that the trial court's finding that Eric's noncompliance was not willful or contumacious, and accordingly its decision denying Suzette attorney fees and the other relief she requested, must be reversed. We remand for a determination of (1) 40% of the additional net income earned by Eric in 2012 (the record contains only the gross figures) and (2) a determination of the appropriate amount of attorney fees to be paid by Eric pursuant to section 508(b) of the Act. 750 ILCS 5/508(b) (West 2016) (requiring a party who failed to comply with a judgment "without compelling cause or justification" to pay the attorney fees of the prevailing party).[2]

¶ 53    Suzette raises three other arguments. Two of these are contingent, seeking relief in the event that we determine that the new Act applied. As we have concluded that the new Act did not apply, we do not reach these two arguments.

_____

[2]Insofar as the trial court's decision not to grant Suzette attorney fees rested on its belief that Suzette did not need such relief because it had calculated Eric's child support arrearage as larger than Suzette expected, the trial court committed a legal error. Child support is intended to supply the needs of the parties' minor children, not to pay for an attorney to enforce the payment of that support. See *In re Marriage of Sobieski*, 2013 IL App (2d) 111146, ¶ 47; *In re Keon C.*, 344 Ill. App. 3d 1137, 1147 (2003).

¶ 54    Suzette's final argument concerns the trial court's calculation of Eric's 2016 child support as represented in the orders entered on June 24, August 22, and October 4, 2016. She contends that the trial court erred in two ways. First, her maintenance should not have been deducted from Eric's net income, as the new Act did not apply to the pending modification petitions. Second, the trial court based its calculation on the wrong starting point: Eric testified that his gross yearly base salary was $415,000, but the trial court mistakenly used $409,517.

¶ 55    As to the first point, Suzette is correct. The only modification petitions before the trial court on June 24, 2016 (when it entered its order setting Eric's interim child support obligation at $1664 biweekly), and in August and October 2016 (when it entered its memorandum decision and subsequent written order adopting that same amount as Eric's child support obligation going forward), were the ones filed in 2013. Thus, as we explained earlier, the new Act did not apply to any child support order entered as the result of those petitions. There was no legal basis for deducting maintenance from Eric's net income for child support purposes in any of these child support orders entered in 2016. We vacate the provisions of these orders relating to the amount of child support due and owing after June 2016 and remand for a new determination of the appropriate amount of Eric's child support obligation. As for Suzette's second point, she will have the opportunity on remand to argue the correct base salary figure to be used in child support calculations.

¶ 56                              III. CONCLUSION

¶ 57    For the reasons stated, that portion of the trial court's orders of June 22 and October 4, 2016, calculating Eric's child support arrearage for the period of 2013 through May 2016 is modified from $150,000 to $99,638.51. As to Eric's child support obligation from June 2016 going forward, the trial court's orders finding that obligation to be $1664 biweekly are vacated and the cause is remanded for a redetermination of that obligation based upon Eric's correct base salary without deducting the amount of maintenance he pays. The trial court's finding that Eric's noncompliance with the judgment of dissolution was not willful or contumacious is reversed, and the issue is remanded for a determination of the proper relief due to Suzette as detailed above (*supra* ¶ 52). As to all other matters, the judgment of the circuit court of Winnebago County is affirmed.

¶ 58    Affirmed as modified in part, reversed in part, and vacated in part.

¶ 59    Cause remanded.

¶ 60              **SUPPLEMENTAL OPINION UPON DENIAL OF REHEARING**

¶ 61    In his petition for rehearing, Eric argues that our holding that the old version of the Act applied to the resolution of the child support modification petitions pursuant to section 801(c) of the Act (*supra* ¶¶ 27-30) is contrary to prior case law. Specifically, Eric cites three cases decided by the Second and Third Districts shortly after the Act (Ill. Rev. Stat. 1977, ch. 40, ¶ 101 *et seq.*) was first adopted in 1977: *Simmons v. Simmons*, 77 Ill. App. 3d 740 (1979), and the cases it relied on (*Legan v. Legan*, 69 Ill. App. 3d 304 (1979), and *Miller v. Miller*, 65 Ill. App. 3d 844 (1978)). Eric did not make this argument or cite these cases in his briefs on appeal, and we could deny his petition for rehearing on this basis alone. See *In re Leslie H.*, 369 Ill. App. 3d 854, 859 (2006) ("[R]ehearing on an appeal can be granted only for purposes of

correcting errors that the court has made, and the party seeking a rehearing cannot assign as error points or arguments that could have been raised before the appeal was resolved."). We prefer to address these cases, however, in the interest of ensuring a uniform body of precedent.

¶ 62 In all three of the cases relied upon by Eric, the reviewing court cited section 801(b) of the 1977 version of the Act (Ill. Rev. Stat. 1977, ch. 40, ¶ 801) in holding that the Act applied to modification proceedings that had been commenced before the Act's effective date. *Simmons*, 77 Ill. App. 3d at 742; *Legan*, 69 Ill. App. 3d at 306-07; *Miller*, 65 Ill. App. 3d at 846. Of course, this is contrary to our holding in this case that the applicability of the new Act to modification proceedings is governed by section 801*(c)*, not 801(b). We believe that these cases (like a similar case decided by our court, *Roqueplot v. Roqueplot*, 88 Ill. App. 3d 59, 62 (1980)), were wrongly decided.

¶ 63 The two earlier cases, *Legan* and *Miller*, did not even consider the potential applicability of section 801(c) but simply cited section 801(b)'s language that the newest version of the Act applies to pending proceedings on issues that have not yet been resolved. Both opinions seemed to view this language as meaning that essentially *all* matters pending on the Act's effective date must be decided under the Act. But this interpretation ignores the plain language of section 801(c), which, unlike section 801(b), specifically addresses modification proceedings. Courts may not depart from the plain language of a statute by reading into it exceptions, limitations, or conditions that conflict with the express legislative intent. *In re Michael D.*, 2015 IL 119178, ¶ 9. "One of the fundamental principles of statutory construction is to view all provisions of an enactment as a whole," and thus "words and phrases must be interpreted in light of other relevant provisions of the statute." *J.S.A. v. M.H.*, 224 Ill. 2d 182, 197 (2007).

¶ 64 Further, the interpretation adopted in *Legan* and *Miller* (and *Roqueplot*) essentially reads section 801(c) out of the Act. If modification petitions fall under section 801(b) as long as they are pending and unresolved, there would never be any circumstances in which section 801(c) applies. This interpretation of section 801 not only is counter to the section's plain language but also violates the precept that a statute must be construed so as to avoid rendering any part of it meaningless or superfluous. *Blum v. Koster*, 235 Ill. 2d 21, 29 (2009).

¶ 65 The last case cited in Eric's petition for rehearing, *Simmons*, did consider the language of section 801(c) and acknowledged that it applied to the pending modification petitions in that case. *Simmons*, 77 Ill. App. 3d at 742. But *Simmons* then abandoned that clear conclusion, deciding to ignore the Act's plain language in favor of following *Legan* and *Miller* to conclude that section 801(b) governed. *Id.* By doing so, the court improperly departed from the plain language of the statute by reading into it limitations that conflicted with the express legislative intent. *In re Michael D.*, 2015 IL 119178, ¶ 9. We reject the court's approach in *Simmons* as unsound. As Eric likewise asks us to ignore the plain language of section 801 and instead simply follow flawed precedent, we reject his argument too.

¶ 66 The remaining arguments raised by Eric lack merit. We deny the petition for rehearing.