2023 IL App (2d) 220216-U
No. 2-22-0216
Order filed February 15, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF DAMIAN ZAGORSKI, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Petitioner-Appellant, | ) ) | |
| and | ) | No. 20-DV-611 |
| ANNA ZAGORSKI, | ) ) ) | Honorable Justin M. Hansen, |
| Respondent-Appellee. | ) | Judge, Presiding. |

JUSTICE KENNEDY delivered the judgment of the court.
Justices Jorgensen and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court did not err in awarding a majority of parenting time to the respondent mother. Therefore, we affirm.

¶ 2    Petitioner, Damian Zagorski, appeals the trial court's allocation of parenting time. Damian argues that the trial court erred in awarding respondent, Anna Zagorski, a majority of the parenting time. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4    Damian and Anna were married on June 6, 2008. During their marriage they had one child, P.Z., born October 13, 2014. On August 26, 2020, Damian petitioned for a dissolution of the marriage.

¶ 5    The matter proceeded to a bench trial in November 2021. Anna testified as follows. At the time she was 34 years old and married to Damian. They were residing in the same household, the marital residence located in Lake in the Hills, with P.Z., who was seven years old. Anna had lupus and epilepsy. When she was under "extreme stress" or was overworking, she might get a seizure. Lupus for her was "kind of like arthritis." Because of the condition, she was often tired, but her current work schedule allowed her to "sleep like a normal person," which helped "take stress off" her health conditions.

¶ 6    Anna worked at Snap-on Tools in Crystal Lake. She began working there in February 2018 and was hired as a distribution associate in December 2018. By August 2020 she was in her current position as part of the company's Rapid Continuous Improvement team, which required her to "do almost everything," including research and development. Her current hours were 6:30 a.m. to 3 p.m., and she sometimes worked overtime. She made $19.92 per hour. She believed she could afford living at the marital residence after the divorce. She acknowledged it may be difficult to afford, but she cited her ability to get overtime work and that her friend, Beata, would be living with her. Beata planned to move in with her after the divorce, and she would pay rent. P.Z. "really, really like[d]" Beata. She was requesting the marital residence because P.Z. needed a stable home.

¶ 7    Anna did not believe it was in P.Z.'s best interest for Damian to have an active role in parental decision-making, but she did believe he should be involved in educational, medical, religious, and extracurricular decisions. She would consider Damian's opinion on those matters

even if she were granted sole decision-making responsibility. She and Damian were both Catholic and would like for P.Z. to follow that faith.

¶ 8    Over the past six months, she and Damian had been doing an "every other day" parenting schedule: she had P.Z. one day, and Damian had him the next. The schedule provided for "more or less" equal parenting time—she sometimes would have to spend extra time caring for P.Z. during Damian's scheduled time when he was unavailable. P.Z. was adjusted to his current schedule, but she qualified, saying, "I'm always there. And whenever he needs something, he will always find me." If P.Z. wet the bed at night, he went to Anna's room, not Damian's. Anna made almost all of P.Z.'s appointments with the doctor and dentist; Damian "didn't even know the name of the doctor."

¶ 9    P.Z. was in the first grade, and Anna wanted him to remain in his current school district. He knew people in the neighborhood and had friends. P.Z. was doing very well in school. He never missed any homework assignments, and he was able to communicate in three languages: Polish, English, and Spanish. Anna was the one who registered P.Z. for school and coordinated after-school care for P.Z., and Damian told her she had done a good job choosing P.Z.'s babysitter, Michelle. Michelle was a neighbor who lived about two blocks from the marital residence.

¶ 10    Anna noted examples where Damian was supposed to be caring for P.Z. but left him to do something else. She testified that Damian was easily frustrated and that, in the past, he did not deal much with anything related to P.Z.—Anna provided the care. She cooked for P.Z. and Damian, and she was the one who bought P.Z. clothes and taught him to tie his shoes and ride his bike. She noted some past incidents where Damian had made derogatory comments about her in front of P.Z., including calling her a "dumb bitch" in 2020, and calling her stupid in 2019 after remarking that she could not even clean the kitchen.

¶ 11 Ultimately, Anna believed Damian was a good father and that it was important for him and P.Z. to have a relationship. Anna wanted a parenting schedule that allowed for Damian to be home and spend time with P.Z. She requested that, following the divorce, P.Z. would have one overnight with Damian per week, preferably Thursday. That way, when there was an every-other-week schedule, Damian would have Thursday through Sunday, and she could get P.Z. ready for the next week of school. She wanted the parenting schedule to be different during the summer than the school year because she believed Damian did not discipline P.Z. as he should when he misbehaved at school.

¶ 12 Beata Trzcinski, Anna's friend, testified as follows. She was a self-employed hairstylist, and she had a six-month old daughter. She described Anna as her "nonbiological sister." For the last nine years they were "very, very best friends. Talk every day. Spend a lot of time together, on even holidays and special occasions." She had taken care of P.Z. for Anna and Damian on several occasions, and P.Z. called her "ciotka" or "auntie" when he saw her.

¶ 13 She and Anna had discussed living together if Anna were awarded the marital residence. They planned to "split all the bills, rent, gas, electric, food." They intended to split the expenses 35/65, with Beata paying the 35%. Beata estimated that she would pay $750 a month, which included contribution toward the mortgage payment.

¶ 14 Beata described Anna as an "amazing" parent. P.Z. always came first. She was affectionate and fun with P.Z. but also had rules for him to follow. She made sure P.Z. was ready for school in the mornings and made sure he ate healthily. When asked if she thought Damian was a good father, she responded that "he was more like a buddy-buddy to P.Z." She described trying to take Anna out for her 30th birthday. Damian was supposed to watch P.Z. while they were out, but he

repeatedly texted and called Anna about how to care for P.Z., and Anna went home early to care for P.Z.

¶ 15    Damian testified as follows. He was 35 years old and currently living with Anna at the marital residence. He was employed at TC Industries as a supervisor. His work schedule as a supervisor was 8 a.m. to 4:30 p.m., and P.Z.'s school started around 8:30 a.m. and ended at 3 p.m.

¶ 16    After he filed the petition for dissolution of marriage in August 2020, he and Anna had a "one on, one off" parenting schedule, and the schedule was working. He believed they were following that schedule about six months prior to him filing the petition. Prior to that, there was no agreed upon schedule. Both he and Anna had days when they were unavailable for agreed-upon parenting time. When he and Anna were both home and something happened at night, P.Z. would go to Anna's room.

¶ 17    Damian believed that he and Anna had "slightly different" parenting styles. She would pull P.Z. aside and have conversations with P.Z.—she would explain things a bit more. Damian had rules for P.Z.: he had to behave, listen, be respectful, and ask when he needed something. P.Z. had chores, which Damian encouraged him to perform. Damian would help P.Z. with his homework. He had consequences for P.Z. if he did not do his homework or misbehaved, like taking away toys or television time.

¶ 18    Damian testified that Anna had made negative comments about him in front of P.Z. About two weeks before trial, she had told P.Z. "don't listen to daddy" regarding a sport that he and P.Z. were watching. She had previously called him names and given him the middle finger in front of P.Z. There was never any physical violence or threat of physical violence between anyone in the family.

¶ 19    Damian agreed to make decisions with Anna regarding P.Z.'s medical care, education, religion, and extracurricular activities. He was willing to consider Anna's opinions on decisions for P.Z., and he believed that he and Anna could cooperate in making decisions in P.Z.'s best interest. He believed Anna was a good mother.

¶ 20    Damian's November 2, 2021, financial affidavit listed monthly "mortgage or rent" payments of $1879.44. He testified that if he were awarded the marital residence, he would be able to continue making the monthly mortgage payments. According to Damian's April 24, 2021, answers to matrimonial interrogatories, the marital residence was purchased in 2017 for $237,000, with approximately $221,000 owing on the mortgage loan. Agnes Fafrowicz, who was the parties' realtor when they purchased the marital residence, opined that at the time of trial, the marital residence would sell for between $285,000 and $300,000.

¶ 21    On May 16, 2022, the trial court issued its memorandum decision and judgment on Damian's petition for dissolution of marriage. Therein, it granted the dissolution of the parties' marriage, divided the marital property, allocated parenting time, provided for shared decision-making, and set maintenance and child support.

¶ 22    The trial court found that Anna earned approximately $41,000 in annual gross income, and Damian's annual gross income was approximately $79,000. The trial court, having considered the statutory factors under section 504 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/504 (West 2020)), found that maintenance was appropriate, and ordered Damian to pay Anna $279.17 in maintenance per month for 76 months. The court also ordered that Damian pay Anna child support in the amount of $314 per month until P.Z. turned 18 or graduated high school, whichever were to occur later.

¶ 23    The trial court assigned the marital residence to Anna. The trial court explained its assignment as "primarily concerned with P.Z. maintaining a stable place of residence. Because Anna [was] assigned the majority of parenting time during the school year, P.Z. [would] be most stable if she maintain[ed] the marital residence."

¶ 24    Turning to the allocation of parental responsibilities, the trial court recounted the evidence related to the best interest factors set forth in section 602.7 of the Act (750 ILCS 5/602.7 (West 2020)). Damian requested equal parenting time, and Anna requested a majority of the parenting time. The trial court noted that they agreed on "significant aspects of decision-making and parenting time" and that their "primary point of disagreement is parenting time during the schoolyear." As to the wishes of the child, the court did not hear evidence of P.Z.'s wishes.

¶ 25    Regarding the child's adjustment to his home, school, and community, the court found that P.Z. was well-adjusted to his current routine, including sharing the marital residence with both parents. The judgement would "inevitably upset" P.Z.'s routine because Anna was awarded the marital residence and Damian would reside elsewhere. At the time of the decision, the trial court did not know where Damian would reside.

¶ 26    For the amount of time each parent spent performing caretaking functions in the 24 months before the petition, the trial court found that Damian's caretaking activities began more recently. Although Damian was "competent to handle caretaking activities during his parenting time," he "relied on Anna to handle many caretaking activities prior to the litigation."

¶ 27    On the physical and mental health of those involved, Damian and Anna each testified that they were in good mental and physical health. However, Anna later testified that she had lupus and epilepsy, although her change in shift time had helped her management of these conditions. P.Z. was healthy.

¶ 28    The trial court continued that the parties were able to cooperate to make decisions, and P.Z. had a strong relationship with both Damian and Anna. The trial court noted that P.Z. had a relationship with Anna's longtime friend, Beata Trzcinski, who planned to move-in with Anna and share expenses after the divorce was finalized.

¶ 29    As to the factors of each parent's level of participation in past significant decision-making and any prior agreement or course of conduct between the parents related to decision-making and caretaking functions for the child, the trial court stated that Anna had "taken the lead on significant decisions and caretaking," but Damian was reasonably involved, especially of late. There was no evidence that P.Z. had special needs, and his day-to-day needs were met by both parents.

¶ 30    The trial court could not determine the distance between the parents' residences, or the difficulty and cost of transporting P.Z., because it was not clear where Damian would reside post judgment. The court presumed he would reside close enough to enable ongoing participation in P.Z.'s daily life. The trial court noted that Anna's work schedule presented "some difficulty" because it began at 6:30 a.m., but the parties currently addressed scheduling issues by relying on a trusted babysitter as well as before- and after-school programming.

¶ 31    Although there was evidence of disagreements between the parties, the trial court did not find that the disagreements weighed heavily on either party's ability to make decisions or parent P.Z. Thus, the trial court concluded that both parties were "perfectly capable of facilitating and encouraging a close and continuing relationship with P.Z. and the other parent." It also found that both parties were willing and able to place P.Z.'s needs ahead of their own. On a positive note, the trial court found that the parties had been able to fashion a parenting time schedule and continue to reside in the marital residence during the course of the litigation.

¶ 32    Remaining factors were either not applicable or the relevant evidence had already been discussed, and the trial court did not find any non-express factor to be relevant.

¶ 33    Having concluded its review of the best interest factors, the trial court decided that Anna should have the majority of parenting time and that Damian should have significant parenting time. The trial court was "primarily concerned with providing stability during the school year." The evidence did not show where Damian's next residence would be, and there was no way to know how far it would be from P.Z.'s school or Anna's home. Furthermore, Anna had spent more time as P.Z.'s primary caretaker. While acknowledging that Damian was willing and able to manage significant parenting time, the trial court noted that "equal parenting time is problematic and trial courts have been instructed to be cautious when entering 50/50 parenting time schedules," explaining that shifting children between households deprives them of a home base.

¶ 34    The trial court found that, although the parties were not generally contentious, an equal parenting time schedule would require a great deal of back-and-forth and effectively deprive P.Z. of a home base. The trial court found this particularly concerning during the school year, where the parties would have to juggle work and school schedules, extracurricular activities, childcare, and a daily routine of packing backpacks and lunches, doing projects, and more. As such, the trial court found that alternating between Anna and Damian's residence every few days was not in P.Z.'s best interest.

¶ 35    Accordingly, the trial court ordered that Damian's parenting time would occur on Thursdays beginning at 5 p.m., continuing to when he would take P.Z. to school Friday morning. Every other week, it would continue until Sunday at 6:30 p.m., or Monday at 6:30 p.m. if there was no school on Monday. During the summer, the trial court set parenting time as alternating between the parties every Friday at 5 p.m., beginning the first week of June. Holidays and school

breaks were likewise divided evenly in gross time awarded, excepting Mother's Day and Father's Day, which were awarded solely to Anna and Damian, respectively. The trial court calculated that Damian had an annual total of 119 overnights before calculating holiday schedules, school breaks, and vacations. The trial court concluded that the parenting time allowed both parents significant time with P.Z. while prioritizing stability during the school year.

¶ 36    This timely appeal followed.

¶ 37                                II. ANALYSIS

¶ 38    At issue in this appeal is whether the trial court erred in allocating the majority of parenting time during the school year to Anna. We accord great deference to the trial court in the allocation of parenting time because it is in the best position to assess witness credibility and determine the child's best interests. *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶ 15. We will overturn a trial court's ruling on parenting time only if it is against the manifest weight of the evidence or is an abuse of discretion. *Id.*; *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 53. A judgment is against the manifest weight of the evidence only when the opposite conclusion is apparent or when the judgment is arbitrary, unreasonable, or not based on the evidence: in other words, if the record contains evidence supporting the judgment, we should affirm. *Vician v. Vician*, 2016 IL App (2d) 160022, ¶ 27. An abuse of discretion occurs when a ruling is arbitrary, fanciful, or unreasonable. *In re Marriage of Benink*, 2018 IL App (2d) 170175, ¶ 32.

¶ 39    Damian argues that the trial court erred in allocating parenting time in a manner that differed substantially from the parties' prejudgment 50/50 parenting schedule. He argues that both the statutory and non-statutory facts weighed in favor of a 50/50 split of parenting time and that the trial court erred in relying on case law cautioning against a 50/50 split. He argues that, because he and Anna are able to cooperate to promote P.Z.'s best interests, a 50/50 split was reasonable,

and the trial court's decision effectively transformed a general caution toward a 50/50 split into a near-absolute prohibition.

¶ 40　Moreover, Damian argues that the trial court's award of the majority of parenting time to Anna was error because the evidence did not support that the award promoted P.Z.'s stability during the school year. Damian argues that, on the one hand, the trial court disregarded his ability to provide P.Z. stability despite assuming that he would reside within close proximity to the marital residence. On the other hand, the court assumed Anna would remain in the marital residence when it was unclear whether she could afford to do so. Last, Damian argues that the trial court's award was error because Anna's work schedule, which begin at 6:30 a.m., would provide less flexibility to manage P.Z.'s before-school schedule.

¶ 41　Anna responds that the trial court's decision was based on the evidence. She points to evidence adduced at trial, including that Anna generally performed the caretaking functions for P.Z. in the two years preceding trial and that she took the lead on significant decision-making for P.Z. Anna further points to the trial court's determination that awarding the marital home to Anna was important to P.Z.'s routine and future success in school.

¶ 42　We hold that the trial court's allocation of parenting time was neither against the manifest weight of the evidence nor an abuse of discretion. Courts shall allocate parenting time according to the child's best interests. 750 ILCS 5/602.7(a) (West 2020). In determining the child's best interests, the court shall consider all relevant factors, including but not limited to the following statutory factors: (1) the wishes of each parent; (2) the wishes of the child; (3) the amount of time each parent spent performing caretaking functions for the child in the 24 months preceding the petition for allocation of parental responsibilities; (4) any prior agreement or course of conduct between the parents for the child's caretaking; (5) the child's interactions or relationship with the

parents, siblings, or others persons who may affect the child's best interests; (6) the child's adjustment to their home, school, and community; (7) the mental and physical health of all individuals involved; (8) the child's needs; (9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's schedules, and the ability of the parents to cooperate in the arrangement; (10) whether a restriction on parenting time is appropriate; (11) the physical violence of threat thereof by a parent against the child; (12) the willingness and ability of each parent to place the needs of the child ahead of their own; (13) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parents and the child; (14) the occurrence of abuse against the child or other members of the household; (15) whether one of the parents is a convicted sex offender or lives with a convicted sex offender; (16) the terms of a parent's military family-care plan if a parent is deployed as a member of the United States Armed Forces; and (17) any other factor the court find relevant. 750 ILCS 5/602.7(b)(1) (West 2020); see *In re Marriage of Virgin*, 2021 IL App (3d) 190650, ¶ 44.

¶ 43     Illinois courts have cautioned against 50/50 allocations of parenting time. *E.g.*, *In re Marriage of Trapkus*, 2022 IL App (3d) 190631, ¶ 35. Where the record showed that parents had too much animosity to cooperate, 50/50 arrangements have been set aside, but where the parties were reasonably loving and capable parents who were sufficiently able to cooperate despite each having argued the other was less capable, a 50/50 arrangement *could be* upheld. *In re Marriage of Virgin*, 2021 IL App (3d) 190650, ¶ 47. Caution against 50/50 arrangements derives, at least in part, from the belief that frequently shifting children between houses is detrimental; "[c]hildren need a home base." *In re Marriage of Swanson*, 275 Ill. App. 3d 519, 524 (1995). Moreover, a "50/50 arrangement is not a substitute for making a difficult choice between two good parents,

especially where such an arrangement may add to the child's insecurity, which is frequently experienced by children of divorce." *In re Marriage of Virgin*, 2021 IL App (3d) 190650, ¶ 52.

¶ 44    Here, the trial court reviewed all of the section 602.7(b) factors in reaching its decision. The trial court correctly concluded that several factors were either inapplicable (factors 11, 14, 15, and 16) or the parties did not present evidence on the factors (factors 2 and 10).

¶ 45    As to the remaining factors, the trial court's findings were based on the evidence. The record supported that several factors were substantially neutral or inconclusive. Both parents desired and agreed upon significant parenting time with P.Z., disagreeing only on parenting time during the school year (factor 1). P.Z.'s relationship with other persons (factor 5) was largely neutral in that both Anna and Damian's families lived in Poland, and he would be able to maintain relationships with both families. However, the trial court implicitly found that the factor slightly favored Anna in that P.Z. had known Beata his whole life and that Beata planned to move in with Anna after the divorce. As to P.Z.'s adjustment to his home, school, and community (factor 6), there was no dispute that P.Z. was doing well in school and had friends in the neighborhood. The court reasonably stated that any judgment was going to upset P.Z.'s routine because, at the time of trial, both parents were living at the marital residence with P.Z., but Damian would reside elsewhere postjudgment. Regarding P.Z.'s needs (factor 8), the record supported that P.Z. had no special needs and that both parents met his day-to-day needs.

¶ 46    The trial court found that factor 9, which included the distance between the parties' residences, was an inconclusive factor because it did not know where Damian would reside postjudgment. The trial court noted that Anna's work schedule presented some difficulty because she began at 6:30 a.m., prior to P.Z.'s school day beginning at 8:30 a.m. However, it reasonably found that the parties had a trusted babysitter and cited before- and after-school programming. We

note that while Anna's work started two hours before P.Z.'s school day, Damian's work ended an hour and a half after the school day, presenting a substantially similar scheduling issue for both parents.

¶ 47    The last neutral factors were factors 12 and 13. The record supported the trial court's findings that both parents were willing to foster a close and continuing relationship between P.Z. and the other parent and that both parents were willing to put P.Z.'s needs ahead of their own. Both Damian and Anna expressed a desire for P.Z. to have a close, continuing relationship with the other and ultimately thought the other was a good parent.

¶ 48    Only factor 7 favored Damian. The record supported that both Damian and P.Z. were healthy. Although Anna initially testified that she was healthy, she later testified to having lupus and epilepsy. However, her testimony also supported that she was effectively managing her conditions on her current work schedule, and the record did not show her conditions prevented her from caring for P.Z. The trial court reasonably did not dwell on this factor.

¶ 49    Two factors favored Anna. Regarding the amount of time each parent spent caretaking in the prior 24 months (factor 3), the trial court reasonably concluded that Damian's caretaking activities began more recently and that he had relied on Anna to handle many caretaking activities prior to litigation. The record supported that Anna was the parent who had primarily cared for P.Z.: she prepared meals for him, scheduled his appointments, bought him clothes, registered him for school, and helped him with his homework. When P.Z. needed help or support, like after wetting his bed at night, he would always go to Anna.

¶ 50    The trial court also found that the parties' prior course of conduct regarding P.Z.'s caretaking (factor 4) favored Anna because she took the lead on significant parenting decisions and caretaking. The record supported this conclusion for largely the same reasons that factor 3

favored Anna. We note that this factor may also contemplate consideration of the parties' prior 50/50 parenting arrangement. Although P.Z. was adjusted to that schedule, it took place while both Damian and Anna were residing at the marital residence with P.Z., and therefore the arrangement had limited relevance to P.Z.'s best interests postjudgment, when Damian would be residing elsewhere. Anna testified that, when they were all living at the marital residence, she was "always there" for P.Z., and "whenever he needs something, he will always find me."

¶ 51    In allocating parenting time, the trial court was "particularly concerned with providing stability during the school year." Stability was a reasonable and important concern with respect to P.Z.'s best interests. The trial court's decision sought to promote stability by minimizing the disruption that frequent back-and-forth exchanges would have imposed on P.Z.'s school week. Moreover, the record supported the trial court's conclusion that Anna had spent more time as P.Z.'s primary caretaker. Specifically, during the school year, Anna had taken care of all manner of school-related activity for P.Z., from getting him clothed and fed to helping with his homework, and P.Z. had been doing very well in school. Thus, the record supported that Anna promoted P.Z.'s stability. When a stable school schedule was not at issue, such as over summer or during school breaks, the trial court provided the parties equal parenting time.

¶ 52    For several reasons, we reject Damian's argument that the trial court's decision was speculative in that it assumed Anna would be able to remain in the marital residence and thus provide P.Z. greater stability while refusing to assume that Damian would reside nearby in a stable environment. First, the trial court did not assume that Anna would be able to permanently reside in the marital residence but, in fact, ordered that Anna obtain financing within six months and that, if she did not or could not, she was to list the residence for sale on or before November 16, 2022. Nor was it unreasonable to let Anna at least try to remain in the marital residence—she was

employed, she was to receive maintenance and child support totaling $593.17 a month, and she had Beata as an expected roommate to help split expenses. Second, Damian's brief incorrectly frames the trial court's decision as awarding Anna the majority of parenting time because she was to receive the marital home. In fact, the trial court awarded Anna the marital home at least in part because it had decided to award her a majority of the parenting time. To wit, the trial court stated, "Because Anna is assigned the majority of parenting time during the school year, [P.Z.] will be most stable if she maintains the marital residence." Last, it is undisputed that the trial court did not know where Damian would reside postjudgment, and it was not error to consider this unknown given that one of the best interest factors is the distance between residences and the cost and difficulty of transporting the child.

¶ 53    We also reject defendant's contention that the trial court's decision transformed caution against 50/50 parenting-time arrangements into a prohibition of the same. The trial court's decision was based on its findings that Anna spent more time as P.Z.'s primary caretaker and that an equal parenting schedule would disrupt P.Z.'s stability during the school year. The former finding was simply an application of statutory best interest factors, and the latter was consistent with prior rationales cautioning against 50/50 allocations of parenting time. See *In re Marriage of Virgin*, 2021 IL App (3d) 190650, ¶ 52 (shifting children between households is detrimental because children need a home base). In short, the trial court based its decision on the facts of the case, mindful of the effect that more frequent custody exchanges would have on P.Z.'s best interests during the school year.

¶ 54    Although Damian spends significant time in his brief illustrating the facts of the two cases cited by the trial court in its decision (*In re Marriage of Virgin*, 2021 IL App (3d) 190650, and *In re Marriage of Swanson*, 275 Ill. App. 3d 519 (1995)), his case illustrations are unavailing.

Notably, the trial court did not illustrate those cases nor make direct comparisons to their facts in reaching its decision—it cited them, appropriately, only for general propositions of law. Damian's reliance on *In re Marriage of Perez*, 2015 IL App (3d) 140876, is also unhelpful. There, the trial court *granted* a 50/50 allocation of parenting time (*id.* ¶ 13), and the appellate court affirmed "based on the specific facts presented" (*id.* ¶ 33). The *Perez* court acknowledged that 50/50 schedules were viewed with caution, but it gave deference to the trial court, noting that the parties lived in close proximity to one another and that their current schedule was working well. *Id.* ¶ 33. There, the child's best interest was the maximum involvement of both parties. *Id.* ¶¶ 28, 32. *Perez* provides meager guidance on whether to *reverse* an unequal parenting schedule when the trial court finds that stability is in the child's best interest.

¶ 55　　In sum, the trial court reasonably focused on P.Z.'s stability during the school year, and the record supported that the parenting schedule promoted his stabilty. The parenting schedule provides P.Z. more time during the school year with Anna, who was his primary caregiver. The schedule during the school year also provides P.Z. with a "home base," which Illinois courts have recognized as in a child's best interests. As such, the trial court's allocation of the majority of parenting time to Anna during the school year was not against the manifest weight of the evidence nor an abuse of discretion.

¶ 56　　　　　　　　　　　　　　III. CONCLUSION

¶ 57　　For the reasons stated, we affirm the judgment of the McHenry County Circuit Court. Due to an error in the appellate court clerk's office, this decision was filed after the decision's 150-day deadline. See Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018).

¶ 58　　Affirmed.