2023 IL App (1st) 190572
Opinion filed: August 17, 2023

FIRST DISTRICT
FOURTH DIVISION

Nos. 1-19-0572, 1-19-0783, 1-21-0017, & 1-21-0185 (Cons.)

| | | |
|---|---|---|
| *In re* PARENTAGE OF A.H., A.H., and A.H., Minors, | ) | Appeal from the |
| | ) | Circuit Court of |
| (Wipaporn T., Individually and as Parent and | ) | Cook County |
| Next Friend on Behalf of Minors A.H., A.H., and A.H., | ) | |
| | ) | No. 11 D 6475 |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Harlow H., | ) | Honorable |
| | ) | Jeanne Cleveland Bernstein, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE ROCHFORD* delivered the judgment of the court, with opinion.
Justice Hoffman concurred in the judgment and opinion.
Presiding Justice Lampkin specially concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1    In this action, petitioner-appellee Wipaporn T., individually and as parent of her triplet sons who were born in Thailand, sought enforcement and modification of a child support order entered by a court in Thailand against respondent-appellant Harlow H., the biological father of the triplets (Thai judgment). Petitioner and the triplets now reside in the United Kingdom, with petitioner's husband. Respondent resides in Illinois. The circuit court entered orders requiring respondent to pay (1) over $76,000 in past due child support under the Thai judgment, (2) $4.5 million into trusts for prospective modified child support, (3) $2 million in retroactive modified child support,

_____

*This case was transferred to Justice Rochford's docket at the end of July 2023.

(4) over $2 million in attorney fees and costs, and (5) $50,000 in sanctions under Illinois Supreme Court Rule 137 (eff. Jan. 1, 2018).

¶ 2    On appeal, respondent argues that the circuit court (1) lacked statutory authority to modify the Thai judgment, (2) erred by applying pre-July 1, 2017, Illinois child support laws, (3) abused its discretion by barring the testimony of respondent's immigration expert, (4) abused its discretion by modifying the child support award in the Thai judgment and making the modified child support retroactive with interest and creating child support trusts, (5) abused its discretion by adopting the terms of the trust agreements, (6) failed to give respondent credit for child support payments and overfunded the child support trusts, (7) erred in awarding attorney fees and costs, and (8) abused its discretion by ordering him to pay $50,000 in sanctions for violating Rule 137.

¶ 3    We affirm in part, reverse in part, vacate in part, and remand for further proceedings.

¶ 4    Respondent is well educated and has had a long and successful career in business. He is married to Susan H. Respondent visited Thailand several times each year between 2001 and 2009 and met petitioner. Petitioner studied marketing in college and, when she lived in Thailand, operated two beauty salons and a spa.

¶ 5    The parties began a romantic relationship in Thailand in 2001, when petitioner was 23 and respondent was 53. Over the course of several years, they would meet when respondent visited Thailand. In 2008, petitioner gave birth in Thailand to the triplets via in vitro fertilization using respondent's sperm and petitioner's eggs. Respondent financially supported petitioner and the triplets until September 2009, when he told Susan about the triplets.

¶ 6    As a result, petitioner filed suit against respondent in Thailand. In December 2010, the Thai court adjudicated him to be the father of the triplets based on DNA test results and ordered him to pay $500 per month for the support of each of the triplets. This judgment was affirmed by

Thailand's intermediate appellate and supreme courts. Respondent, however, failed to pay any child support.

¶ 7 Petitioner and the triplets left Thailand in May 2012 and currently reside in the United Kingdom with petitioner's husband, Winton, a British citizen.

¶ 8 In June 2011, petitioner filed the petition that gave rise to this action and sought recognition, enforcement, and modification of the Thai judgment. The circuit court, in August 2013, enrolled the Thai judgment under the principles of comity, determined that respondent owed $76,242.46 in past due child support under that judgment, and ordered him to pay that sum within 30 days. In July 2015, the circuit court stayed all matters while the Thai judgment was under review in the Supreme Court of Thailand. The stay was lifted in May 2016 after the Supreme Court of Thailand issued a certificate of case finality. In January 2017, this court affirmed the August 2013 judgment of the circuit court. *In re Parentage of A.H.*, 2017 IL App (1st) 133703.

¶ 9 Meanwhile, in December 2016, respondent sued petitioner in the United Kingdom, claiming that she had violated an agreement to keep their relationship private. In October 2017, the court struck the suit, holding that it was an abuse of process. Respondent unsuccessfully appealed that decision to two courts of review in the United Kingdom.

¶ 10 In April 2017, petitioner filed a three-count petition in the circuit court of Cook County. Count I sought a modification of the Thai judgment so as to increase child support. Count II sought an injunction directing respondent to execute the requisite paperwork for the triplets to be recognized as United States citizens and an order requiring respondent to pay petitioner's attorney fees and costs. Count III sought an order registering the Thai judgment.

¶ 11     Respondent moved to dismiss the petition, arguing that the circuit court lacked statutory authority to modify the Thai judgment under section 615 of the Uniform Interstate Family Support Act (Support Act) (750 ILCS 22/615 (West 2016)).

¶ 12     In October 2017, the circuit court appointed a representative for the children and later converted that representative to their guardian *ad litem* (GAL). In March 2018, the court approved the GAL's costs to travel to the United Kingdom to meet with the triplets, petitioner, and her husband. The GAL later filed a report of his findings.

¶ 13     On May 2, 2018, petitioner filed an emergency motion for a hearing on her request for injunctive relief against respondent, alleging that she and the triplets were facing potential deportation from the United Kingdom to Thailand because they did  not have proof of sufficient means and financial support. Petitioner asked that respondent be required to establish a trust on behalf of the triplets with a minimum of £80,000 to cover the costs of private health insurance and schooling.

¶ 14     During argument on the emergency motion, petitioner informed the court that she did not have the financial resources to meet the triplets' medical and academic needs. She could not bring an action in the United Kingdom courts because of her immigration issues, and they had no passports and could not travel to seek relief in the courts of Thailand. The circuit court found that respondent's failure to comply with the Thai judgment and strategy of litigating this matter "to death" resulted in the emergency situation the triplets now faced. The court denied respondent's motion to dismiss the petition and ordered him to complete the documentation concerning the triplets' United States citizenship. Additionally, the court set deadlines for respondent to respond to the petition, the emergency motion, and the GAL's amended fee petition. The court set the

hearing on the emergency motion for June 22, 2018, and set the trial on counts I and III of the petition for August 27, 2018.

¶ 15    On May 23, 2018, petitioner filed a petition seeking $171,606 in attorney fees and a ruling on prior fee petitions, which had been pending since October 2017. Respondent moved to strike the fee petition.

¶ 16    On that same day, respondent filed a motion to discharge the GAL and strike his report and fee petition. He again raised section 615 of the Support Act and an argument that the circuit court was not authorized to modify the Thai judgment. This motion was denied.

¶ 17    On June 27, 2018, petitioner filed an amended fee petition, requesting the court to order respondent to fund a trust for $1 million for incurred and prospective legal fees. Respondent filed responses to the fee petition and amended fee petition, arguing that the circuit court could not award interim fees and lacked statutory authority to create a trust to secure the payment of any attorney fees.

¶ 18    On July 20, 2018, the circuit court ordered respondent to tender $1.75 million to the GAL's IOLTA account[1] by July 25, 2018, to "fund an interim and prospective attorney fees and costs trust for the benefit of the attorneys for petitioner and attorneys for the minor children." When respondent did not comply with that order, the court, on July 25, 2018, appointed a receiver over respondent's income and assets and temporarily enjoined him from transferring or otherwise disposing of his income and assets (TRO).

_____

[1]An IOLTA account is a pooled client trust account, with interest or dividends accruing to the Lawyers Trust Fund of Illinois. See Ill. R. Prof'l Conduct (2010) R. 1.15(j)(2) (eff. July 1, 2015) (now codified as Rule 1.15C (eff. July 1, 2023)).

¶ 19    On July 27, 2018, the circuit court amended the initial receiver order and detailed the scope of the receiver's authority. The receiver was given the authority to take exclusive custody and control of respondent's real and personal property, obtain full access to his assets, including bank accounts, and pay the $1.75 million owed by respondent into the GAL's IOLTA account from respondent's assets. After receiving the money from respondent's bank account, the receiver transferred the $1.75 million to the GAL's IOLTA account.

¶ 20    On August 1, 2018, the court stayed prior orders with respect to the receiver collecting and directing respondent's income and assets; however, the TRO that was part of the initial receiver order was to remain in place except to the extent necessary for respondent to pay monthly child support payments.

¶ 21    On August 6, 2018, the court entered a preliminary injunction (injunction order) enjoining respondent from transferring, withdrawing, or otherwise disposing of his assets subject to a cap of $30,000 per month for necessary living expenses and child support payments.

¶ 22    Respondent filed interlocutory appeals of the circuit court's initial receiver order, amended receiver order and injunction order. After consolidating the appeals, on March 29, 2019, we affirmed the circuit court's orders. *In re Parentage of A.H.*, 2019 IL App (1st) 181590-U.

¶ 23    The circuit court held a trial on counts II and III of the petition over nine different days between June 22 and September 5, 2018.

¶ 24    Prior to the start of the trial, respondent argued that modification of the Thai judgment was unwarranted because petitioner and the triplets soon would be deported from the United Kingdom to Thailand, where the standard and cost of living were lower. The circuit court ruled that it would not consider the immigration status of respondent and the triplets, as such evidence was not relevant to a determination of the best interests of the triplets.

¶ 25    Petitioner testified that the triplets were then nine years old. Respondent had asked her to have children with him. Early on, respondent said he would provide funds for the triplets to attend private schools so that they could have the best possible education and establish trusts to provide for their needs. Respondent provided her with money to purchase a house, a commercial building, and some vacant land, all in Thailand. He also gave her the use of his credit card.

¶ 26    In September 2009, during a telephone conversation with petitioner and Susan, respondent again stated that he would support the triplets. However, after petitioner sent respondent and Susan a video of the triplets, respondent stopped petitioner from using the credit card and no longer agreed to support them.

¶ 27    Instead, petitioner sold the jewelry that respondent had given her and mortgaged the house in Thailand to help pay for their living expenses and pay some of her legal fees. From 2009 through 2012, she borrowed a total of $117,878 from her husband to pay for house expenses and the Thai lawyers and borrowed money from her husband's parents. She has not been able to pay the loans back. From 2010 to 2012, the triplets were often sick, and she incurred large medical expenses. She did not receive any child support from respondent until 2012 or 2013.

¶ 28    Petitioner left Thailand in May 2012 and married her husband in October 2012. In 2013, petitioner went to the United Kingdom on a tourist visa with the triplets and her husband. The triplets began attending a free public school in the fall of that year. She could not afford to enroll them in a private school.

¶ 29    One of the triplets suffers from vitiligo, asthma, and allergies. His vitiligo worsened over delay in treatment, and he has lost pigment in his left eye. This son found reading, writing, and spelling difficult. A second triplet was very small and susceptible to any "flu bugs going around." A better diet would help this son, but she could not afford to take him to a nutritionist. Petitioner

7

obtains public medical care for the triplets because she cannot afford private doctors. The triplets had not been to a dentist in the United Kingdom, again due to lack of funds.

¶ 30    Petitioner, the triplets, and her husband live in a 1000 square foot home. They cannot afford computers and have only an iPad, which is six or seven years old. The triplets have never been on a vacation or participated in any organized sports, summer camps, or extracurricular activities. Although the triplets attend a free school, petitioner must pay for books, lunches, school trips, and uniforms.

¶ 31    Petitioner is prohibited from working in the United Kingdom due to her visa status. She and her husband have a small bank account but have no credit cards or a checking account. Her husband, a train driver, paid the bills. The United Kingdom provided him with some public aid for the benefit of the triplets. Petitioner wishes to stay in the United Kingdom with the triplets because it was safer than Thailand and offered a better education and because the triplets spoke only English.

¶ 32    Petitioner presented a 2018 financial affidavit, which showed her debts were $593,847.49, and her assets were $2185.22. The affidavit set out the triplets' current expenses and also the amounts she believed they needed (the requested expenses). The current monthly expenses for her and the triplets totaled $6005.70. The requested monthly expenses totaled $ 26,982.84, which included $11,589.99 for tuition at the private Dragon School.

¶ 33    Petitioner has exhausted her deportation appeals in the United Kingdom. She did not comply with an order by the immigration authorities to report to a detention center. She never filed a request in the courts in Thailand to modify the Thai judgment.

¶ 34    Petitioner's husband, Winton, testified that he earns approximately $28,000 annually as a train driver. He has paid most of the triplets' expenses since he married petitioner. The family

8

began receiving public benefits in 2016. He testified about the cost of the Dragon School and why he believed it suited the triplets better than the public schools.

¶ 35    The GAL, Michael Bender, testified about his 2018 visit with the family in the United Kingdom. Their family situation is a happy one, and they are living in a safe place under modest conditions. There was no indication that petitioner or her husband was overspending. Two of the triplets excelled in school; one struggled because of dyslexia and developmental issues. The GAL recommended that the triplets attend private school and that the struggling child receive tutoring. He also recommended private health insurance for the triplets based on their need for "faster healthcare" and that the triplets receive a deposit of £80,000 into an account in the United Kingdom to increase the probability that the family would be able to stay together.

¶ 36    Respondent testified that he, at the age of 71, and Susan, at the age of 66, have one child, their son N.H., who was born in 2017. Respondent did not believe the triplets were his children.

¶ 37    He owns two residences, one in Joliet and one in Chicago. He purchased the Joliet property before he married Susan and the Chicago property after the marriage, both in his own name. The Joliet property is approximately 100 acres, consisting of 50 acres of farmland, a large house, a gatekeeper's cottage, and a garden. The section of farmland is valued at about $10,000 to $15,000 an acre. He estimated the Chicago property to be worth at least $2 million. During this litigation, both properties were placed in joint tenancy with Susan.

¶ 38    Respondent admitted to sending petitioner several e-mails regarding the triplets. In a January 2009 e-mail, he told her not to worry about money and that she and the triplets were his top priority.

¶ 39    In September 2009 e-mails, respondent indicated that he would ensure that the triplets received their United States citizenships, provide $12,000 in monthly support, set up a trust fund

for the triplets with an initial deposit of $144,000, provide funds for college with an initial deposit of $13,000 for each triplet, and take additional steps with a will and trusts. Petitioner turned down his offers and asked for more money.

¶ 40    Respondent already had given petitioner over $1 million, a $270,000 house in Thailand, an automobile, and a credit card to use for the triplets. Petitioner charged approximately $550,000 to that credit card from 2004 to 2009. He sent petitioner about $425,000 for investments she was making between 2001 and 2009. He also bought her a commercial building in Thailand for about $109,000.

¶ 41    The wills of respondent's parents had provided that, in the event that he predeceased them, his portion of the estates would pass to his descendants *per stirpes*. However, the wills were changed to prevent the triplets from receiving any inheritance. Respondent is the trustee and/or beneficiary of certain family trusts, including an educational trust and residuary trusts worth millions of dollars. The triplets are not beneficiaries of respondent's trusts nor any of his family's trusts.

¶ 42    Respondent has contributed $20,000 to a college fund for N.H., and his will has a revocable trust, of which N.H. is the beneficiary. N.H. is a beneficiary of respondent's life insurance and covered by his health insurance. Respondent is the trustee of a charitable and educational trust, and N.H. is a beneficiary. The corpus of that trust was between 5 and 10 million dollars. N.H.'s clothing costs exceeded $750 per month, and babysitting costs were about $20,000 a month.

¶ 43    During this litigation, respondent issued a $4 million promissory note to Susan, which was not based on any loan. He also issued a $10 million promissory note to Susan for her legal advice, although she was not a lawyer; the note is to be paid out of his current and future assets. In

September 2014, respondent signed a document stating that he was giving Susan all of his worldly possessions "in consideration of her countless hours of devotion."

¶ 44 Respondent's and Susan's 2015 joint tax return showed adjusted gross income of $1,294,315.74 and gifts of $48,044.54. His adjusted gross income in 2016 was $1,293,000. According to his October 2017 financial affidavit, respondent was the managing director of an economic consulting company and had a gross monthly income of $84,550. That affidavit listed his assets as a $1,674,040 individual retirement account, a $789,706 401(k) account, a $693,649 company savings and investment plan, a $321,000 stock plan, a $290,000 investment account, an investment account he valued at $27,000, and $11 million in securities at Northern Trust with a margin of $5 million, leaving a net of $6 million.

¶ 45 After hearing all the evidence, on September 14, 2018, the circuit court entered its written judgment. As to credibility, the court found petitioner and her husband were credible and clear in their testimony. The court found that respondent was not credible. He continued to deny that he was the father of the triplets, which was contrary to the DNA evidence and the findings in the Thailand litigation, and he had undervalued assets or made them subject to promissory notes for Susan.

¶ 46 The court listed the following substantial change in circumstances that justified an increase in child support, which included the following: the triplets were eight years older and needed new clothing, better schooling, and medical care; in moving to the United Kingdom, petitioner was prohibited from working due to her overstayed visa status; petitioner was forced to sell her home and automobile to prosecute an action against respondent and defend herself in actions brought by him; and their standard of living now was so low that the family received public assistance.

¶ 47 The court then found that the creation of a child support trust for each of the triplets under section 503(g) of the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/503(g) (West 2016)) was in their best interests. The court found the trusts were necessary because respondent had been extraordinarily and vexatiously litigious in this case and in the Thailand and United Kingdom courts. Furthermore, respondent had taken steps to prevent the triplets from receiving benefits under his will and from various family and personal trusts. In an attempt to avoid increased child support, he had transferred his interests in assets to Susan and created questionable promissory notes in Susan's name. The court concluded that it would be prohibitively expensive to require respondent to obtain life insurance in an amount sufficient to provide for the triplets' support and education considering his age.

¶ 48 The court then determined the amount by which the child support award of the Thai judgment should be increased under the provisions of section 505 of the Marriage Act (*id.* § 505) in effect prior to July 1, 2017. The court estimated that respondent's monthly income was $133,113.84 and therefore a guideline child support amount for the triplets would be $42,596.42 per month. However, based on the relevant factors in section 505, the court found that a below-guideline amount would be sufficient to meet the needs of the triplets.

¶ 49 The circuit court ordered respondent to pay prospective child support of $11,000 per month for each of the triplets until they reach 20 years of age and to fund each of the triplets' trusts with $1.5 million. The court also made the modified monthly child support amount retroactive to April 1, 2013. The funds in the trusts were to be used for child support, private medical and dental insurance payments, and extracurricular activities. The court declined to order private school tuition. Any question about college expenses was reserved until further order of the court.

¶ 50    Although the circuit court found that the $4.5 million total trust corpus amount was slightly less than the full amount respondent would be required to pay, it believed that with accrued interest the trusts would be sufficiently funded. The court ordered that the GAL and petitioner's husband act as cotrustees and ordered petitioner's counsel to prepare and tender section 503(g) trust agreements within 21 days.

¶ 51    The court also ordered that the previously established attorney fees trust remain in place until all fee and cost matters were resolved. Any remaining funds in that trust would be distributed equally into the three section 503(g) trusts.

¶ 52    Litigation in the case continued. On November 5, 2018, the court ruled that respondent's modified child support arrearage was $1,979,972.09 and directed the receiver to collect the funds from his assets.

¶ 53    On January 25, 2019, petitioner moved the court for sanctions under Illinois Supreme Court Rule 137 (eff. Jan. 1, 2018). The motion summarized how respondent misused legal procedures in concurrent litigation across three continents to deny and delay his child support payments. She identified and discussed a subpoena, an affidavit, and 10 separate pleadings that allegedly violated Rule 137.

¶ 54    On March 5, 2019, the circuit court made an express written finding that there was no just reason to delay either enforcement or appeal, or both, of the November 5, 2018, order. Thereafter, respondent filed a notice of appeal (case No. 1-19-0572) from that order.

¶ 55    On March 15, 2019, the circuit court entered a uniform order of support relating to the $33,000 monthly child support award, resulting in a notice of income withholding being served on respondent's employer. On April 15, 2019, he filed a notice of appeal of that order (case No. 1-19-0783).

¶ 56    On May 16, 2019, petitioner filed an emergency petition seeking the issuance of a rule to show cause against respondent for his failure to pay the modified child support arrearage or fund the child support trusts as ordered by the court. The court issued the rule to show cause and ordered him to deposit $4.5 million into the GAL's IOLTA account. Ultimately, the receiver, at the court's direction, collected the $4.5 million from respondent's assets to fund the child support trusts.

¶ 57    Also on May 16, 2019, an emergency motion by petitioner was filed seeking the turnover of the modified child support arrearage collected by the receiver. The court granted the motion, ordered the GAL to transfer $2 million to petitioner in the United Kingdom, and modified the arrearage to $2,069,070.84, adding $89,098.75 to the award for interest.

¶ 58    On June 3, 2019, after a hearing, the court granted the motion for Rule 137 sanctions and ordered respondent to pay $50,000 to the GAL for deposit into the triplets' section 503(g) trusts.

¶ 59    In August 2019, respondent moved the court to limit enforcement of the judgment to the amount needed to pay the sum awarded for future child support. He also moved the court to adjudicate and apply credits based on child support he had already paid and to dissolve the uniform order of support that garnished his wages. Respondent supplemented this motion in January 2021, requesting (1) a total credit of $824,034 based on paid child support and (2) that the child support trusts be collectively funded with a net amount of $3,173,224.06, instead of $4.5 million.

¶ 60    On December 9, 2020, the circuit court approved the terms of the child support trust agreements and ordered all signatories to execute them. Respondent filed a notice of appeal from this order on January 7, 2021 (case No. 1-21-0017).

¶ 61    In January 2021, the circuit court denied respondent's motion to limit enforcement and for child support credits with the exception of ordering petitioner to cooperate with the dissolution of the uniform order of support.

¶ 62    On February 10, 2021, the circuit court entered its last orders in this action, which denied all pending claims and took the case off call. On February 22, 2021, respondent filed a notice of appeal directed at every order entered in the circuit court in the years 2017 through 2021 (case No. 1-21-0185). We have consolidated respondent's four appeals.

¶ 63    We begin with respondent's argument that the circuit court was without authority to modify the child support award of the Thai judgment.

¶ 64    The traditional common-law principles of comity allow Illinois courts to enforce the terms of a child support order entered in the courts of a foreign nation, absent some showing of fraud in the procurement of the judgment or that recognition of the judgment would do violence to some strong public policy of this state (see *In re Marriage of Kohl*, 334 Ill. App. 3d 867, 880-81 (2002); *Codo, Bonds, Zumstein & Konzelman, P.C. v. Federal Deposit Insurance Corp.*, 148 Ill. App. 3d 698, 703 (1986); *Hager v. Hager*, 1 Ill. App. 3d 1047, 1051 (1971)). We previously held that the circuit court properly extended comity to the Thai judgment after finding it was not contrary to Illinois public policy and respondent failed to establish that it was obtained by fraud or that he was denied a full and fair opportunity to present a defense. *In re Parentage of A.H.*, 2017 IL App (1st) 133703, ¶ 1. This ruling is the law of the case. See *Weyer v. Illinois Workers' Compensation Comm'n*, 387 Ill. App. 3d 297, 307 (2008).

¶ 65    Under comity, courts of this state should give a foreign judgment of paternity and child support the same degree of enforceability as to arrearages as they would give to a similar judgment of an Illinois court. See *In re Marriage of Kohl*, 334 Ill. App. 3d at 880-81. Furthermore, the law of both Illinois and Thailand allows for the modification of an existing child support order upon a showing of a substantial change in circumstances. 750 ILCS 5/510(a)(1) (West 2016); 750 ILCS 46/802(f) (West 2016); Thai. Civ. & Com. Code, tit. III, § 1598/39. We believe that when, as in

this case, a modifiable child support order of a foreign jurisdiction is enrolled in Illinois under principles of comity, an Illinois court has jurisdiction to modify the support order, just as a court in a foreign jurisdiction could do. In other words, once a foreign judgment is properly enrolled as a domestic support judgment, an Illinois court may entertain and decide an application for enforcement or modification of the support award under section 510 of the Marriage Act (750 ILCS 5/510(a) (West 2016)) and section 802(f) of the Illinois Parentage Act of 2015 (Parentage Act) (750 ILCS 46/802(f) (West 2016)). See also *In re Support of Burks*, 100 Ill. App. 3d 700, 703 (1981) ("provisions relating to the support of minor children are always modifiable," though "only upon a showing of a substantial change in circumstances").

¶ 66     However, respondent argues that the circuit court was prohibited by the Support Act from modifying the Thailand child support judgment because (1) the Support Act governed petitioner's petition to modify the Thailand judgment based on section 105(a) of the Support Act (750 ILCS 22/105(a) (West 2016)), which provides that an Illinois tribunal "shall apply" articles 1 through 6 of the Support Act to a support proceeding involving a child residing in a foreign country; (2) section 615 of the Support Act (*id.* § 615) provides that the circuit court may assume jurisdiction to modify a foreign country's child support order if the foreign country lacks or refuses to exercise jurisdiction to modify its child-support order pursuant to its laws; and (3) petitioner failed to meet her burden to establish the requisite conditions of section 615 because she never asked the Thai court to modify its child support judgment.

¶ 67     Furthermore, at oral argument, respondent contended that the circuit court lacked authority under the Support Act to modify the Thailand support judgment because section 603 of the Support Act (*id.* § 603(c)) provides that the circuit court "shall recognize and enforce, but may not modify, a registered support order if the issuing tribunal had jurisdiction."

¶ 68    The Support Act was drafted by the National Conference of Commissioners on Uniform State Laws and was first promulgated in 1992. See Unif. Interstate Family Support Act, Prefatory Note, 9 U.L.A. 161 (2005). In 1996, Congress mandated adoption of the Uniform Interstate Family Support Act by all states as a condition of receiving federal funds for child support enforcement (42 U.S.C. § 666(f) (2000)), and by 1998, the act had been enacted in every state. The Uniform Interstate Family Support Act was " 'designed to streamline and expedite interstate enforcement of child support decrees.' " *In re Marriage of Gulla*, 234 Ill. 2d 414, 425-27 (2009) (quoting *Walton v. State ex rel. Wood*, 50 P.3d 693, 695 (Wyo. 2002)); see also *In re Marriage of Hartman*, 305 Ill. App. 3d 338, 342 (1999) (observing that the Support Act "creates a mechanism which facilitates the reciprocal enforcement or modification of child support awards entered in Illinois and other states which have also adopted the [Support Act]").

¶ 69    We review *de novo* the issue of statutory construction of the Support Act. See *Acme Markets, Inc. v. Callanan*, 236 Ill. 2d 29, 35 (2009).

¶ 70    Section 615 of the Support Act, titled "Jurisdiction to modify child-support order of foreign country," provides:

> "(a) Except as otherwise provided in Section 711, if a *foreign country* lacks or refuses to exercise jurisdiction to modify its child-support order pursuant to its laws, a tribunal of this State may assume jurisdiction to modify the child-support order and bind all individuals subject to the personal jurisdiction of the tribunal ***." (Emphasis added.) 750 ILCS 22/615 (West 2016).

¶ 71    Respondent's argument, that the Support Act prohibited the circuit court from modifying the Thailand child support order because petitioner failed to show that Thailand refuses to exercise jurisdiction, lacks merit because Thailand is not a "foreign country" as that term is defined by the

Support Act. Section 102(5) of the Support Act defines "foreign country" as a country other than the United States that authorizes the issuance of support orders and (1) has been declared under the law of the United States to be a foreign reciprocating country, (2) has established a reciprocal arrangement for child support with this state as provided in section 308 (*id.* § 308), and (3) has enacted a law or established procedures for the issuance and enforcement of support orders that are substantially similar to the procedures under the Support Act. *Id.* § 102(5)(A)-(5)(C).

¶ 72    Thailand has not been declared a foreign reciprocating country under federal law and has not established a reciprocal arrangement for child support with Illinois. See *id.* § 102(5)(A), (5)(B), (5)(D).

¶ 73    Although respondent now argues on appeal that Thailand meets the definition of a foreign country because it has established laws and procedures for the issuance and enforcement of support orders that are substantially similar to those under the Support Act (see *id.* § 102(5)(C)), he argued the opposite position before the circuit court. Specifically, respondent argued below that (1) the fact that the United States has not declared Thailand to be a foreign reciprocating country was strong evidence against a finding that its laws and procedures were substantially similar to the Support Act, and (2) other courts have held that the mere fact that a country may recognize foreign judgments generally was insufficient to establish substantial similarity under the Support Act (see *Kalia v. Kalia*, 151 Ohio App. 3d 145, 2002-Ohio-7160, 783 N.E.2d 623, ¶¶ 46-47; *Haker-Volkening v. Haker*, 547 S.E.2d 127, 131 (N.C. Ct. App. 2001)). Having argued below that Thailand is not a foreign country under the Support Act, respondent is precluded from taking the opposite position on appeal. See *Board of Education of Woodland Community Consolidated School District 50 v. Illinois State Charter School Comm'n*, 2016 IL App (1st) 151372, ¶ 40.

¶ 74 Additionally, respondent's argument is contrary to his own evidence. He submitted to the circuit court the April 2, 2013, affidavit of Ms. Sasirusm B. Chunhakasikarn, a licensed attorney in Thailand with over 13 years of experience specializing in international family law matters. She stated that Thailand's law did not "contain any laws or procedures with respect to the issuance of foreign child support orders" or "any laws or procedures with respect to the recognition or enforcement of foreign child support orders." Additionally, Thai law did not "make any direct provision for the enforcement of foreign child support judgments in the Thai courts."

¶ 75 We therefore reject respondent's argument that Thailand meets the definition of a foreign country under section 102(5) of the Support Act.

¶ 76 Respondent argues that section 105(a)(3), which provides that Illinois courts shall apply articles 1 through 6 of the Support Act to a support proceeding involving an obligee or child residing in a foreign country, applies here because petitioner and the triplets are the obligees of the Thai judgment and they now reside in the United Kingdom. See 750 ILCS 22/105(a)(3) (West 2016). However, section 105(a)(3) does not apply in this case because Thailand is not a "foreign country" as defined in the Support Act, and as a result, its judgment is not a child-support order under section 102(2) of the Support Act, which defines a child support order as "a support order for a child, including a child who has attained the age of majority under the law of the issuing state or foreign country" (*id.* § 102(2)).

¶ 77 Respondent argues for the application of section 603(c), which prohibits modification of child support orders. However, section 603(c) is limited to "registered support order[s]" (*id.* § 603(c); *id.* § 616 (stating the procedure to register a child support order under sections 601 through 608)). Because Thailand is not a foreign country under section 102(5), the Thai judgment is not a registered "support order" as defined in section 102(28). See *id.* § 102(28) (defining

support order as an order issued in a foreign country for the benefit of a child). For the same reason, the Thai judgment cannot be a "foreign support order" under section 102(6) because it was not issued by a "foreign tribunal" as defined in section 102(7). See *id.* § 102(6) (defining a foreign support order as a support order of a foreign tribunal); *id.* § 102(7) (defining foreign tribunal as the tribunal of a foreign country).

¶ 78    In the end, sections 603 and 615, upon which respondent's arguments are based, did not deprive the circuit court of authority to modify the Thai judgment.

¶ 79    We conclude that the circuit court was authorized under the principles of comity and the Marriage Act and Parentage Act to consider and adjudicate the petition to modify the Thai judgment and that the Support Act did not preclude the court from so acting.

¶ 80    Respondent argues that, even if the circuit court had authority to modify the Thai judgment, the circuit court erroneously applied the child support guidelines contained in section 505 of the Marriage Act that were in effect before July 1, 2017. See 750 ILCS 5/505 (West 2016). Relying upon *In re Marriage of Elliott*, 2019 IL App (4th) 180628, he asserts that the circuit court should have used the income-sharing model contained in the post-July 1, 2017, version of section 505. Petitioner, however, citing *In re Marriage of Benink*, 2018 IL App (2d) 170175, argues that the circuit court properly applied the provisions of section 505 that were in effect before July 1, 2017.

¶ 81    The legislature has made substantial changes to section 505, which became effective on July 1, 2017. In place of the child support guidelines of the pre-July 1, 2017, version of the statute, the legislature substituted an income-sharing approach to the determination of each parent's share of the basic support obligation. See Pub. Act 99-764 (eff. July 1, 2017). Section 801 of the Marriage Act, which was amended effective January 1, 2016, as part of Public Act 99-90 (Pub. Act 99-90 (eff. Jan. 1, 2016)), discusses the applicability of the Marriage Act to proceedings in

various stages of completion. 750 ILCS 5/801 (West 2016). Courts have used section 801 to determine whether the prior version of section 505 governs the determination of child support or whether the current version is applicable. See, *e.g.*, *Benink*, 2018 IL App (2d) 170175, ¶ 29 (finding prior version applicable); *Elliott*, 2019 IL App (4th) 180628, ¶¶ 42-43, 52 (finding current version applicable).

¶ 82 Section 801 provides:

> "(a) This Act applies to all proceedings commenced on or after its effective date.
>
> (b) This Act applies to all pending actions and proceedings commenced prior to its effective date with respect to issues on which a judgment has not been entered. ***
>
> (c) This Act applies to all proceedings commenced after its effective date for the modification of a judgment or order entered prior to the effective date of this Act." 750 ILCS 5/801 (West 2016).

¶ 83 In 2011, petitioner filed her petition to modify the child support award contained in the 2010 Thai judgment. Because both the entry of the Thai judgment and the filing of the petition seeking modification of that judgment took place before the effective date of the current versions of sections 505 and 801, under subsection 801(c), the pre-July 1, 2017, version of section 505 would govern the modification of child support in this case. *Id.* § 801(c).

¶ 84 We find support for our conclusion in *Benink*, 2018 IL App (2d) 170175. In that case, the parties divorced in 2010, and their judgment of dissolution contained child support provisions regarding their four children. *Id.* ¶¶ 3-4. In 2013, both parents petitioned to modify child support, and the hearing commenced in February 2016. *Id.* ¶¶ 8-9, 11. The trial court entered an interim order for child support under the current version of section 505. *Id.* ¶ 11. In its judgment, the trial court characterized the petitions as pending proceedings raising issues on which a judgment had

not been entered, believed the petitions fell within subsection 801(b), and therefore declared that the current version of section 505 applied in the child support modification proceedings. *Id.* ¶¶ 12, 28.

¶ 85 On review, however, the Appellate Court, Second District, reversed the trial court. The Second District reasoned that, because a judgment had been entered on the issue of child support in the parties' 2010 dissolution judgment, their petitions to modify that judgment

> "plainly fell within subsection (c) of the statute, which governs 'proceedings *** for the modification of a judgment *** entered prior to the effective date of this Act.' [Citation.] However, under subsection (c), the new Act applies only to modification proceedings commenced after January 1, 2016, the effective date of the new Act." *Id.* ¶ 29 (quoting 750 ILCS 5/801(c) (West 2016)).

Because the parties filed their modification petitions in 2013, the current version of section 505 did not apply to the proceedings on those petitions. *Id.*

¶ 86 As discussed, respondent relies on *Elliott*, 2019 IL App (4th) 180628, to support his argument that the current child support provisions apply in this case. In *Elliott*, the parties divorced in 2009, and their dissolution judgment contained provisions for child support, day care expenses, and arrearage payments. *Id.* ¶ 4. Thereafter, the court issued a July 2012 order regarding child support and day care expenses and a June 2013 order regarding day care expenses. *Id.* ¶ 5. In 2014, the mother petitioned to modify the 2012 order, and the father petitioned to modify the 2013 order. *Id.* ¶ 1. In January 2018, the trial court entered a written order regarding the petitions to modify child support and day care expenses. *Id.* ¶ 24. The trial court calculated the child support under the current version of section 505 that went into effect after July 1, 2017. *Id.*

¶ 87    On appeal, the Appellate Court, Fourth District, affirmed the ruling that the current version of section 505 applied to the child support modification petitions even though those petitions were filed before section 505's effective date. The *Elliott* court determined that section 801(b) made the current version of section 505 applicable to the modification proceedings because the mother's and father's respective petitions to modify the 2012 and 2013 orders raised issues on which a judgment had not been entered. *Id.* ¶ 49.

¶ 88    We follow the holding in *Benink* "that the applicability of the new Act to modification proceedings is governed by section 801*(c)*, not 801(b)." (Emphasis in original.) *Benink*, 2018 IL App (2d) 170175, ¶ 62. *Elliott*'s interpretation ignores the plain language of section 801(c), which, unlike section 801(b), specifically addresses modification proceedings. Courts may not depart from the plain language of a statute by reading into it exceptions, limitations, or conditions that conflict with the express legislative intent. See *id.* ¶ 63. " 'One of the fundamental principles of statutory construction is to view all provisions of an enactment as a whole,' and thus 'words and phrases must be interpreted in light of other relevant provisions of the statute.' " *Id.* (quoting *J.S.A. v. M.H.*, 224 Ill. 2d 182, 197 (2007).

¶ 89    Furthermore, *Elliott*'s interpretation

"essentially reads section 801(c) out of the Act. If modification petitions fall under section 801(b) as long as they are pending and unresolved, there would never be any circumstances in which section 801(c) applies. This interpretation of section 801 not only is counter to the section's plain language but also violates the precept that a statute must be construed so as to avoid rendering any part of it meaningless or superfluous. [Citation.]" *Id.* ¶ 64.

¶ 90    We conclude that the circuit court properly applied the prior version of section 505 when modifying the Thai judgment.

¶ 91    We next consider respondent's argument that the circuit court abused its discretion by barring him from presenting the expert testimony of immigration attorney Victoria Nassar as irrelevant to the determinations of modified child support and the best interests of the triplets. He contends the court erred in finding the evidence irrelevant when (1) petitioner's emergency motion specifically pleaded the threat of imminent deportation as a basis for modification of the Thai judgment, (2) petitioner testified that the triplets were not receiving adequate medical care because she did not want to draw attention to their immigration status by using the public healthcare system, and (3) the court in modifying child support assumed that the family will remain in the United Kingdom. He asserts that the permanence of the triplets' residence in the United Kingdom was relevant to a determination of their reasonable expenses and that Nassar would have rebutted the GAL's report and testimony regarding the family's immigration status.

¶ 92    Petitioner responds that the court properly excluded Nassar's opinion concerning possible deportation as speculative and irrelevant because she and the triplets have lived in the United Kingdom from 2013 to the present time. Further, any error in excluding Nassar's testimony was harmless because the assertion that they were to be imminently deported proved not to be true.

¶ 93    A challenge made to the trial court's ruling on the admissibility of evidence is reviewed under an abuse of discretion standard. *Mulloy v. American Eagle Airlines, Inc.*, 358 Ill. App. 3d 706, 711 (2005). A trial court abuses its discretion only when no reasonable person would agree with the trial court. *Dawdy v. Union Pacific R.R. Co.*, 207 Ill. 2d 167, 177 (2003). In determining whether there has been an abuse of discretion, this court does not substitute its judgment for that of the trial court or even determine whether the trial court exercised its discretion wisely. *DiCosola v. Bowman*, 342 Ill. App. 3d 530, 536 (2003).

¶ 94    According to the record, discussions about the issue of whether immigration evidence was relevant occurred at different points of the proceedings. At the June 12, 2018, hearing on discovery issues, the court acknowledged petitioner's emergency motion for financial relief, which claimed she and the triplets were potentially facing deportation from the United Kingdom to Thailand due to their inability to show proof of sufficient means and financial support. Nevertheless, the court informed the parties that the trial would not pertain to protecting the family from deportation. Instead, the relevant issues were whether respondent fulfilled "his moral and legal duty" to the triplets and whether they were taken care of "the way they should be."

¶ 95    When the trial started on June 22, 2018, the court denied respondent's motion *in limine* to recognize the British Home Office's November 2016 decision in which it found that it was in the triplets' best interest to return to Thailand. The court stated that it was not going to deal with the immigration issue. The parties then filed cross-motions to bar immigration expert testimony. The court barred the testimony of both experts as irrelevant. The court explained that it was concerned with the best interest of the triplets and "the fact that [this issue] dovetail[s] along with some immigration issues happens to be coincidental." Later, when respondent's counsel sought clarification of the court's ruling regarding Nassar's testimony, the court again stated that it was not interested in expert testimony about immigration but wished "to stick to the issue that concern[s] the court, and those immigration ones are not of primary concern."

¶ 96    At the close of his case and after his renewed request to call Nassar as an expert witness was denied, respondent made an offer of proof by reading his amended witness disclosure into the record. That disclosure stated that Nassar, an immigration lawyer in the United Kingdom, would testify about the United Kingdom's laws regarding immigration, asylum, and lawful residency. Nassar would opine, based on her experience and case documents, that (1) the circuit court's view

would not change the United Kingdom's decision that it was in the triplets' best interests to return to Thailand; (2) court-ordered financial support from respondent would not change the United Kingdom's decision to deport petitioner and the triplets; (3) the United Kingdom had formed an adverse view of petitioner's conduct and character; (4) her husband, who had lived and worked in Thailand, could support petitioner and the triplets in Thailand with no hardship or insurmountable obstacles; and (5) the financial relief that petitioner sought in her emergency motion would not prevent her and the triplets' deportation or increase their minimal chances of being readmitted into the United Kingdom should they reapply for residency in the future.

¶ 97    Section 510(a) of the Marriage Act (750 ILCS 5/510(a) (West 2016)) and section 802(f) of the Parentage Act (750 ILCS 46/802(f) (West 2016) allow a party to petition the court to modify a child support order upon a showing of a substantial change in circumstances. If petitioner and the triplets were deported from the United Kingdom to Thailand, that would certainly be relevant to a determination of whether, and to what extent, there would be a substantial change in circumstances sufficient to support a petition to modify the Thailand court's support order. There is merit in respondent's argument that Nassar's testimony regarding the United Kingdom's laws pertaining to immigration, asylum, lawful residency, and the imminence of petitioner's and the triplets' deportation to Thailand was relevant. We need not reach this issue, as we find that any error in this regard was harmless where the record established that petitioner and the triplets have remained in the United Kingdom. *Schnuck Markets, Inc. v. Soffer*, 213 Ill. App. 3d 957 (1991) (an error in the admission or exclusion of expert testimony may be deemed harmless unless prejudice is clearly shown).

¶ 98    We next review respondent's argument that petitioner failed to show a substantial change in circumstances sufficient to justify modification of child support. He asserts that the Thai

judgment contemplated the triplets' increased expenses as they grew older, the increased expenses of living in the United Kingdom could not serve as a substantial change in circumstances, and the court awarded an amount of child support that was not rationally related to the triplets' reasonable needs but rather is disguised maintenance to petitioner.

¶ 99    A trial court's determination of the appropriate level of child support will only be reversed if it is an abuse of discretion (*In re Marriage of Alexander*, 231 Ill. App. 3d 950, 953 (1992)) or if the factual predicate for the decision is against the manifest weight of the evidence (*Milligan v. Cange*, 200 Ill. App. 3d 284, 294 (1990)). "A decision is against the manifest weight of the evidence if the facts clearly demonstrate that the court should have reached the opposite result." *In re N.B.*, 191 Ill. 2d 338, 346 (2000).

¶ 100   A child is not expected to live at a minimal level of comfort, "only entitled to receive support for his basic 'shown needs,' " while the noncustodial parent lives a life of luxury. *In re Marriage of Bussey*, 108 Ill. 2d 286, 297 (1985). The trial court must consider the standard of living the child would have enjoyed absent parental separation. *Id.*

¶ 101   At the trial, petitioner presented documentary evidence as to the expenses relating to the triplets and the report of the GAL. Petitioner, her husband, and the GAL testified to the triplets' living conditions, health and other needs, and the financial strains on the family. Respondent's arguments notwithstanding, the court did not err in considering evidence of the triplets' situation in the United Kingdom, where they have been living and continue to live as a basis for a change of circumstances.

¶ 102   The evidence showed that the triplets are now older and as they have aged their needs and expenses have increased way beyond what was contemplated by the Thai judgment. They are interested in pursuing extracurricular activities and camps and need computers, but petitioner is

without funds for such things. The cost of living is higher in the United Kingdom, and the triplets' medical and dental needs have not been met through the public health system. The health of two of the triplets has suffered. Petitioner sold her home in Thailand and other assets. She can no longer work and contribute to the triplets' financial requirements. She and her husband have devoted the vast majority of their money to raising the triplets. They were forced to obtain loans to cover the triplets' expenses while they live modestly without overspending. The family now receives public assistance. The record sufficiently demonstrated a substantial change in circumstances, which justified a modification of the Thai judgment's child support award.

¶ 103    We also conclude that the amount of the award of prospective child support in the monthly sum of $11,000 for each of the triplets was neither an abuse of discretion nor against the manifest weight of the evidence and did not amount to disguised maintenance. The modified combined child support of $33,000 for the triplets is below the $42,596.42 support guideline set forth in the pre-July 1, 2017, version of section 505 of the Marriage Act, which was based on an estimate that respondent's monthly income was at least $133,113.84. Further, the triplets' living conditions contrasted sharply with those of respondent, Susan, and N.H., who reside in two luxurious residences with significant household expenses of $20,050. Additionally, respondent's personal expenses were $20,000. N.H has benefited from generous expenditures on his clothing ($750) and care ($20,000 for babysitting services) and has funds, trusts, and wills in place to meet his future needs.

¶ 104    Respondent also argues that the court abused its discretion in making the modified support award retroactive to April 1, 2013, the date when petitioner and the triplets took up residence in the United Kingdom. The question of whether the modified support award should be retroactive is

within the sound discretion of the circuit court. *In re Marriage of Heil*, 233 Ill. App. 3d 888, 895 (1992).

¶ 105   Respondent asserts that the modified support award should not be made retroactive because "the children cannot go back in time and go to school all over again to the tune of the court's ill-conceived $33,000+ monthly tuition." First, contrary to respondent's assertion, the modified child support amount did not include the cost of private school tuition for the triplets. Second, respondent admittedly cites no authority for finding an abuse of discretion when the amount of the modified retroactive award is the same as the modified prospective award. And he does not make a cogent argument to support the implication that the triplets, from the time they moved to the United Kingdom in 2013 until the issuance of the September 2018 judgment, should bear the hardship of foregoing the financial support to which they were entitled. For the same reasons that we found no abuse of discretion in the modified prospective child support awarded by the trial court, we find no abuse of discretion in its award of modified retroactive child support.

¶ 106   Respondent next argues that the circuit court erred by awarding $89,098.75 of prejudgment interest on his $1,979,972.09 arrearage of modified child support payments. He argues that interest could not accrue until the retroactive award and entered because he could not know what amount he was to pay until that time. We find no merit in the argument.

¶ 107   On November 5, 2018, the circuit court calculated respondent's modified child-support arrearage to be $1,979,972.09, and on May 17, 2019, it awarded $89,098.75 for statutory interest on that sum at the statutory 9% rate. 750 ILCS 5/505(b) (West 2016); 735 ILCS 5/12-109(b) (West 2016). The amount of interest due on the arrearage for the period from November 5, 2018, the date that the arrearage was calculated, through May 17, 2019, the date that the circuit court awarded the statutory interest, is $89,098.75. There was no error in the calculation and award of interest.

¶ 108   Respondent also challenges the circuit court's creation of the child support trusts. He contends that the court's contempt powers were sufficient to enforce his future support obligations. We disagree.

¶ 109   The circuit court created the child support trusts for the benefit of the triplets under section 503(g) of the Marriage Act. That section states:

> "The court if necessary to protect and promote the best interests of the children may set aside a portion of the jointly or separately held estates of the parties in a separate fund or trust for the support, maintenance, education, physical and mental health, and general welfare of any minor, dependent, or incompetent child of the parties." 750 ILCS 5/503(g) (West 2016).

The Parentage Act contains a similar provision. 750 ILCS 46/802(d) (West 2016). A need for such protection arises when the noncustodial parent is either "unwilling or unable to make child support payments." *In re Marriage of Petersen*, 319 Ill. App. 3d 325, 343 (2001). Section 503(g) does not require, as a prerequisite to establishing a trust, a finding that the noncustodial parent has been in willful contempt of a court order. *In re Marriage of Gocal*, 216 Ill. App. 3d 221, 224-25 (1991); see also *In re Marriage of Hobson*, 220 Ill. App. 3d 1006, 1014 (1991).

¶ 110   Before the trusts were created, respondent had a history of not paying child support. He continues to assert that he is not the triplets' father. Because respondent failed to comply with certain orders to make payments, the court found it necessary to appoint a receiver. During the litigation, respondent engaged in suspicious tactics to protect his interests and assets. He has acted to prevent the triplets from inheriting under his will. As the circuit court concluded, it would be difficult and expensive for respondent to obtain an insurance policy to secure the child support

payments. The manifest weight of the evidence demonstrates the necessity for the creation of the trusts and that the trusts were in the best interests of the triplets.

¶ 111    Respondent argues that the court had no authority to adopt Thai law for the duration of his child support obligation—*i.e.*, 20 years of age as the age of majority—but then set the amount he must pay in modified child support based on Illinois law. We disagree. Petitioner sought to modify the amount of the child support award in the Thai judgment based on a substantial change in circumstances. The court chose to respect the duration of the award set by the Thailand court. Although the Support Act does not apply to the petition to modify, this decision was consistent with the policy of the Support Act. Section 105(b) of the Support Act provides that an Illinois court which recognizes a support order on the basis of comity *may* apply the provisions of articles 1 through 6 of the Support Act. 750 ILCS 22/105(b) (West 2016). Section 611(c) of the Support Act provides that a tribunal of this state may not modify the duration of the obligation of a child support order (*id.* § 611(c)). The circuit court acted within its discretion to keep the duration of the obligation of support until the triplets turn 20 years of age.

¶ 112    Respondent also challenges the terms of the trust agreements that he claims (1) give the trustees unfettered discretion to distribute the trust corpus at any time, (2) include petitioner's husband and not a disinterested party as a cotrustee, (3) make respondent the trust grantor and obligate him to pay taxes on income earned by the trust principal, (4) change respondent's estate plan, and (5) impose fee-shifting to deter him from asking for an accounting of the trust.

¶ 113    This court reviews the imposition of a section 503(g) trust under an abuse of discretion standard. *Melamed v. Melamed*, 2016 IL App (1st) 141453, ¶ 41. When the court orders the creation of a section 503(g) trust for the benefit of a child, it must describe the terms of the trust with sufficient particularity; must determine a dollar amount of child support and require the

appointed trustee to make regular payments from the fund; may provide for the payment of the child's other reasonable expenses, such as maintenance, education, and general welfare; and must provide for the termination of the trust upon the emancipation of the child and for the payment of any residual to the party who funded the trust. *In re Marriage of Wolfe*, 298 Ill. App. 3d 510, 516 (1998); *Hobson*, 220 Ill. App. 3d at 1015.

¶ 114 We first consider respondent's argument that the trust agreements allow unfettered distribution of the trust funds and find it lacks merit. Article 2.1 of the trust agreements requires the trustee to distribute $11,000 monthly to each child, "which amounts shall be used to provide for [the child's] support, education, maintenance, physical and mental health, and general welfare as such terms shall be determined from time to time pursuant to 750 ILCS 5/503(g) and 750 ILCS [46/]802(d)." This provision defines the amount of the monthly child support as determined by the circuit court and delineates the purposes of the payments. Article 2.1 also provides that "the Trustee shall distribute the income and principal of the trust in such amounts and at such times to [the child] as required for [the child's] medical and education needs." This provision means that on the occasions when the monthly payments have been used for the explicit purposes set out in article 2.1, the trustee may distribute funds for emergency medical and educational needs only. The distributions are subject to defined standards and not to the trustee's whims. As a further check, each party is entitled to an annual accounting and has the right to contest the terms of an annual accounting. Furthermore, article 9.3 of the trust agreement states that "no person shall have the power to alter, amend, revoke or terminate the Agreement or the terms of the trust[s] hereby created in any respect."

¶ 115 Respondent's objection to petitioner's husband serving as the cotrustee also lacks merit. The other cotrustee is the GAL, who acts in the best interests of the triplets and is appointed by the

court. Moreover, the circuit court has the authority to control all substantial decisions of the trusts. Article 5.10D of the trusts provides: "Notwithstanding any other provision herein contrary, if a non-U.S. person is ever serving as co-trustee, only the co-trustee who is a U.S. person, U.S. trustee or a U.S. Bank shall have the authority to control all substantial decisions of the trust." Therefore, petitioner's husband, who is not a "U.S. person," has no authority to control any substantial decisions of the trusts.

¶ 116    We also reject respondent's arguments against being the grantor of the trusts. He is the grantor of the trusts because he is the person whose assets funded the trusts. See 26 C.F.R. § 1.671-2(e)(1) (2022); Internal Revenue Serv., *Abusive Trust Tax Evasion Schemes–Questions and Answers*, https://www.irs.gov/businesses/small-businesses-self-employed/abusive-trust-tax-evasion-schemes-questions-and-answers (last visited Aug. 10, 2023) [https://perma.cc/WM5Y-NYLN].

¶ 117    Respondent objects to the trust language in article 2.2 of the trusts, which provides that, if he is not living when the trusts terminate, then "the Trustee shall distribute the remaining trust among the heirs at law of Harlow." Section 8.1 of the trusts defines "heirs at law" as "individuals entitled to receive his property as if he died intestate," which includes the triplets.

¶ 118    The record indicates that petitioner and the circuit court were concerned that respondent's estate plan disinherits the triplets. Nevertheless, we conclude that the circuit court abused its discretion by approving the trust provision that, if respondent died before the termination of the trusts, then any remaining funds upon termination of the trusts shall be distributed to his heirs at law. Instead, any remaining funds should be returned to respondent's estate. When the trusts terminate, the triplets will be 20-year-old adults, and respondent's obligations to support them under the modified Thai judgment and the purpose of the trusts ends. The issue of their best

33

interests as minors does not extend to ensuring that they receive a share of any remaining trust funds as an inheritance when they are adults. Accordingly, we vacate the approval of article 2.2 of the trust agreements and remand this matter to the circuit court with directions to cause the amendment of the trust agreements to provide that, if respondent dies before the trusts terminate, any funds remaining upon termination are to be paid to his estate.

¶ 119   Finally, we review respondent's challenge to the fee-shifting provision of the trust agreements. Under this provision, a person who makes a claim that does not result in a material change in the annual accounting must pay the reasonable fees incurred by the parties subject to such contest. The court's approval of the fee-shifting provision was not an abuse of discretion in light of respondent's litigiousness and ability to expend legal fees.

¶ 120   In summary, except for the language in article 2.2 that bypassed respondent's estate plan, the court did not abuse its discretion in approving the terms of the trust agreements.

¶ 121   We turn to respondent's arguments that he is entitled to a credit for prospective modified child support payments that were made after the entry of the September 2018 support judgment and before the section 503(g) trusts were funded with $4.5 million from his assets. He also argues that the circuit court overfunded the trusts by over $500,000. On these issues, we agree with respondent.

¶ 122   According to the record, in March 2019, a uniform order of support for income withholding was served on respondent's employer. In April 2019, the court set out a procedure to transfer the child support withheld from respondent's pay to the GAL. However, in June 2019 the receiver reported to the court that he had collected $5 million from respondent's assets to fund the section 503(g) trusts. Respondent later moved the court for a credit for child support he had paid and would pay between the date of the September 2018 judgment and the date when the section 503(g) trusts

34

would be funded. Petitioner objected, stating that respondent would be reimbursed for any overpayment upon the termination of the trusts when his obligation to support the triplets concludes. In December 2020, the court approved the terms of the section 503(g) trusts, which were subsequently funded with the $4.5 million from respondent's assets. In January 2021, respondent supplemented his request for a credit and stated:

> "[T]he total sum of child support paid to [petitioner] by the GAL since that day of entry of the Judgment is $824,034. The source of these funds includes both the monies collected by the Receiver and the funds withheld from paychecks by the State Disbursement Unit."

¶ 123    At the January 12, 2021, hearing on his motion, respondent maintained that, based on his interpretation of the GAL's December 21, 2020, accounting and table of child support payments through October 2020, he had paid a total of $824,034 in prospective modified child support since the September 2018 judgment. The GAL stated that he did not know if this calculation was correct. The GAL and petitioner requested that any credits and debits be determined after the triplets were no longer receiving support or college expenses and the trusts were terminated.

¶ 124    In denying respondent's motion, the circuit court stated that it was reluctant to reduce the trust funds based on respondent's less than admirable behavior over the past 10 years and because the court thought that the $4.5 million in trust funds would be sufficient with accumulated interest.

¶ 125    Respondent argues on appeal that the court's January 2021 denial of his motion for credit effectively modified the September 2018 support judgment by increasing his obligation to fund the trusts by $824,034.

¶ 126    We conclude that, if after the entry of the September 2018 judgment and before the section 503(g) trusts were funded, respondent paid prospective modified child support from either income

withholding or other sources of funds in addition to the $4.5 million that was used to fund the trusts, he is entitled to credit for such an additional amount. The September 2018 judgment set the maximum amount that respondent must contribute to fund the trusts at $4.5 million. Consequently, any prospective modified child support payments he made in addition to that $4.5 million constitutes a substantial overpayment of the amount he was ordered to contribute. Moreover, the detriment to him from such a substantial overpayment would not be alleviated by the trust provisions affording him a refund of any overpayment when the trusts are terminated. However, we are unable to determine the correct amount of the credit from the record and the parties' briefs. We reverse the circuit court's order that denied respondent's claim for child support credit. We remand to the circuit court with directions to determine the correct amount of prospective modified child support he paid after the date of the September 2018 judgment and before the trusts were funded with $4.5 million and order that sum be refunded to respondent from the corpus of the trusts.

¶ 127   Next, respondent argues that, in ordering each of the trusts be funded with $1.5 million ($4.5 million collectively), the court abused its discretion by overfunding the trusts by $500,000. In making this argument, he explains that, by multiplying his gross monthly child support obligation of $33,000 by the number of months from the date of the September 2018 judgment to the date the triplets reach the age of 20 years on November 5, 2028 (121 months plus 4 days), a total of $3,997,258.06 would be necessary to guarantee his prospective modified support obligation to the triplets. Respondent asks this court to correct the circuit court's mathematical error under Illinois Supreme Court Rule 366 (eff. Feb. 1, 1994).

¶ 128   In response, petitioner argues that the gross $33,000 monthly modified child support award to the triplets is below the support guideline and, therefore, the court properly denied respondent's

claim that the trusts were overfunded. She contends that, if the trusts are overfunded, he "will get it back" upon the termination of the trusts.

¶ 129 The circuit court rejected the assertion that the trusts were collectively overfunded by $500,000. The court believed that the $4.5 million in funds was actually insufficient to meet the modified child support payments but would be enough with accrued interest. The court added that the modified child support judgment contemplates the possibility of additional future expenses for medical and educational needs and, if "[respondent is] no longer around, it would be impossible to further fund the trust[s]." The court also observed that, if the trusts are overfunded, respondent will receive any remaining funds when the trusts terminate.

¶ 130 Respondent is correct in his calculation that $3,997,258.06 is the amount of prospective modified child support that he is required to pay for the triplets until they reach age 20. The circuit court's justification for requiring that each trust be funded with $1.5 million was its speculation that other future expenses might arise that would not be covered by the $11,000 monthly support payments. The circuit court's justification ignores the fact that each of the trusts will be earning income for which respondent will be required to pay the taxes. There is nothing in the record supporting the court's speculation that the prospective monthly child support of $11,000 plus the income that will be earned on the principal of the trusts will be insufficient to satisfy the needs of the triplets. We believe that funding each of the trusts with $1,332,419.35 ($3,997,258.06 collectively) is more than sufficient to guarantee respondent's prospective child support obligations with the interest earned available for any unforeseen necessities. As a consequence, we vacate that portion of the circuit court's judgment requiring that each of the triplets' trusts be funded with $1.5 million and direct the circuit court on remand to modify its judgment to require that each of the trusts be funded with $1,332,419.35, order the trust agreements amended to reflect

funding at that level, and order that $167,580.65 be refunded to respondent from the corpus of each trust. The refund required under this paragraph is in addition to any refund that he is entitled to for prospective modified child support that he paid after the date of the September 14, 2018, judgment and before the trusts were funded.

¶ 131   Next, we review respondent's argument for reversal of the fees and costs awarded to petitioner's counsel, the GAL, the children's representative, and all others in connection with petitioner's efforts to modify the child support. He maintains that the fee and costs award was improper because petitioner did not prevail under the Support Act in that the act barred the circuit court from modifying the Thai judgment. For the reasons stated earlier, we reject the premise underlying the argument, namely, that the Support Act governed the petition to modify the Thai judgment. Accordingly, we also reject respondent's argument that the Support Act preempts the application of any and all other provisions of Illinois's law relating to the modification of child support and the award of attorney fees and costs.

¶ 132   Whether a court has authority to award attorney fees is a question of law subject to *de novo* review. *In re Marriage of Newton*, 2011 IL App (1st) 090683, ¶ 10. Once the Thai judgment was enrolled in Illinois under principles of comity, the circuit court correctly applied section 508(a) of the Marriage Act and section 809 of the Parentage Act, which provide that the circuit court may order a party to contribute to the other party's attorney fees in light of their respective financial situations. See 750 ILCS 5/508(a) (West 2020); 750 ILCS 46/809 (West 2020). An award of attorney fees and costs in a parentage case is reviewed for an abuse of discretion. *In re Custody of C.C.*, 2013 IL App (3d) 120342, ¶ 40.

¶ 133   Based on the financial evidence, the circuit court estimated respondent's monthly income to be $133,113.84, and his testimony and October 2017 financial affidavit showed he possessed

substantial assets consisting of real property, retirement accounts, securities, and stock plans. In contrast, the evidence showed petitioner was unemployed; in debt; and being supported by her husband, loans, and public assistance. Based upon the gross disparity in the parties' financial conditions and respondent's ability to pay, we find no abuse of discretion in the circuit court's order that respondent pay all of petitioner's attorney fees and costs and the fees and expenses of the GAL and children's representative. We note also that respondent has made no argument in his brief that the amount of fees and costs awarded by the circuit court was excessive.

¶ 134   As his final argument, respondent argues that the circuit court erroneously imposed a $50,000 sanction against him pursuant to Rule 137. He contends that the court's finding that "every pleading *** [he] filed has been in bad faith and in an attempt to continue needless litigation, thereby increasing the costs of litigation to [petitioner]," is belied by the record.

¶ 135   In ruling on the motion for sanctions, the court found that respondent sought reconsideration of nearly every court order and had appealed a series of the court's orders; refused to comply with the court's orders; filed frivolous lawsuits in the United States, Thailand, and the United Kingdom; pursued a moot argument regarding the finality of the Thai judgment; attempted to avoid his child support obligations; changed his positions as to the application of the Support Act; filed oppositional pleadings to an originally agreed-upon order to convert the child representative appointment to a GAL appointment; sought a substitution of the judge for cause on the first day of trial; and filed for bankruptcy. The court stated that, because the DNA evidence in the Thailand court had determined that he was the triplets' biological father, every pleading respondent filed in the circuit court case was in bad faith and an attempt to continue needless litigation and increase petitioner's litigation costs. In defending herself and the triplets, petitioner went into debt, lost her real estate and personal property, and was forced to live on loans.

¶ 136   Rule 137 provides, in relevant part, that the circuit court may impose an appropriate sanction on a represented party for pleadings, motions, or other documents not well grounded in fact and warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law or that has been interposed for an improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. Ill. S. Ct. R. 137(a) (eff. Jan. 1, 2018). A circuit court's order imposing Rule 137 sanctions is reviewed for an abuse of discretion. *Mohica v. Cvejin*, 2013 IL App (1st) 111695, ¶ 47.

¶ 137   The record in this case establishes that, in imposing sanctions against respondent under Rule 137, the circuit court considered facts that are not the basis for an award of sanctions under the rule, including that respondent filed lawsuits against petitioner in Thailand and the United Kingdom and for bankruptcy, petitioner went into debt and lost her real estate and personal property, and she was forced to live on loans. The court also appears to have considered that respondent refused to comply with its orders and filed a series of appeals, neither of which is the basis for the imposition of sanctions under Rule 137. We have no way of knowing the weight that the circuit court gave to these facts in arriving at the amount of the sanction that it imposed. As a consequence, we vacate the $50,000 sanction, and on remand, we direct the circuit court to rule on the motion for Rule 137 sanctions, taking into consideration only those matters for which a sanction might be imposed under the rule, namely, pleadings, motions, or other documents not well grounded in fact and warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law or that have been interposed for an improper purpose.

¶ 138   For the foregoing reasons, we reverse the circuit court's order denying respondent's motion for a credit for prospective modified child support he may have paid after the entry of the September 2018 support judgment and before the section 503(g) trusts were funded with $4.5

million from his assets. We vacate (1) that portion of the circuit court's judgment that approved article 2.2 of the trust agreements, which provides that, if respondent is not living when the trusts terminate, then "the Trustee shall distribute the remaining trust among the heirs at law of Harlow"; (2) that portion of the circuit court's judgment requiring that each of the triplets' trusts be funded with $1.5 million; and (3) the $50,000 Rule 137 sanction assessed against respondent. In all other respects, we affirm the judgment and orders of the circuit court, and we remand this matter to the circuit court with directions to (1) order that the triplets' trust agreements be amended to provide that, if respondent dies before the trusts terminate, any funds remaining upon termination are to be paid to his estate; (2) determine the correct amount of credit to which respondent is entitled based on the amount of child support that he paid after the entry of the September 14, 2018, judgment and before the section 503(g) trusts were funded with $4.5 million from his assets and order that the sum be refunded to respondent from the corpus of the trusts; (3) modify its judgment to require each of the trusts be funded with $1,332,419.35, order the trust agreements modified to reflect funding at that level, and order $167,580.65 refunded to respondent from the corpus each of the three trusts; and (4) rule on petitioner's motion for Rule 137 sanctions, taking into consideration only those matters for which a sanction might be imposed.

¶ 139   Affirmed in part, reversed in part, and vacated in part.

¶ 140   Cause remanded with directions.

¶ 141   PRESIDING JUSTICE LAMPKIN, specially concurring in part, and dissenting in part.

¶ 142   I concur with the majority's decisions regarding the trial court's authority to modify the Thailand judgment, the trial court's application of the pre-July 1, 2017, child support guidelines, the modified child support judgment, the child support trust terms, and the award of attorney fees and costs.

¶ 143  However, I respectfully dissent from the majority's decisions regarding the alleged overfunding of the trusts by $502,741.95 and the Rule 137 sanction award. I would affirm the trial court's decisions that funded the trusts at $4.5 million and awarded petitioner $50,000 in Rule 137 sanctions.

¶ 144  Furthermore, I specially concur with the majority's decisions regarding Harlow's immigration expert witness and entitlement to credit for prospective modified child support he allegedly paid.

¶ 145                                    I. Funding the Trusts at $4.5 million

¶ 146  I dissent from the majority's conclusion that funding the trusts at $4.5 million constituted an overfunding of $502,741.95. First, the majority's decision to refund this amount to Harlow based on its belief that the trial court engaged in speculation and failed to account for the income the trust would generate is not based on any argument Harlow has raised on appeal. See *Stevens v. Village of Oak Brook*, 2013 IL App (2d) 120456, ¶ 30 ("it is not the role of this court to *** develop arguments on a party's behalf"). Rather, Harlow argued on appeal only that the trusts were overfunded because the trial court made a calculation error and entered a ruling contrary to its own findings.

¶ 147  As to Harlow's arguments on appeal, the record establishes that the trial court did not make a calculation error or enter a ruling contrary to its findings. The Thailand judgment awarded the triplets college costs and fees, and the trial court did not modify that portion of the Thai judgment. Rather, the court reserved ruling on the cost of the triplets' college education in its September 2018 judgment. The plain terms of the September 2018 judgment did not limit it to $3,997,258.06, *i.e.*, Harlow's monthly $33,000 payments until the triplets reach the age of 20 years in 2028. To the contrary, the judgment stated that the "trust corpus amounts [of $1.5 million for each of the three

trusts were] slightly less tha[n] the full amount Harlow will be required to pay over the years, but, interest should accrue in sufficient amount[s] to cover the differences."

¶ 148  Moreover, at the January 12, 2021, motion hearing, the trial court rejected Harlow's assertion that the triplets' trusts should be funded a net amount of $3,173,224.06, which sum Harlow then claimed represented the $33,000 monthly child support payments until the triplets turn 20 years old in 2028. The court stated that the $33,000 monthly payments did not set the maximum amount of Harlow's child support obligation because the September 2018 judgment stated that certain probable future expenses like the amounts of the triplets' medical expenses and college educations were unknown. The court stated that the $4.5 million trust fund amount was less than Harlow's total financial obligation to the triplets during their lifetime, but the court hoped that accrued interest and dividends would make up the difference. Furthermore, the court stated that the trusts might be underfunded depending on interest rates, so the court denied Harlow's request to reduce the amount of the trusts.

¶ 149  The trial court funded the trusts at $4.5 million based on the unique facts of this case, including Harlow's advanced age and obsessive litigiousness, the impracticality of requiring him to obtain life insurance to cover likely future expenses, his testimony that there was "no upper limit" to the amount of legal fees he would pay in this matter to dispute and defeat any support for the triplets, his efforts to disinherit the triplets, and the fact that it took about a decade to reach a judgment and set up the trusts in this matter. The court stated that the purpose of ordering the trust funding at $4.5 million was to curtail any unnecessary litigation and delay when the triplets need these funds in the future. The court stated that it did not want these support issues ultimately being resolved in probate court after Harlow's demise. The court stated: "if we come to the age where these children are college age or need additional funding and [Harlow is] no longer around, it

would be impossible to further fund the trust." The court added that, if the trusts turned out to be overfunded, then Harlow would get the excess amount back when the trusts terminated.

¶ 150   The trusts merely hold Harlow's money in reserve for the triplets; the trusts are not an outright support award of $4.5 million to the triplets. The money in the trusts exists apart from Harlow's other assets to ensure that he meets his future support obligations. Courts have the authority to create these types of trusts and the discretion to fashion the appropriate remedy in the case. The trial court's main rationale for the trusts was to prevent future inevitable litigation of support payments, particularly in the probate court when Harlow dies. The majority's decision to reduce the trust funds by $502,741.95 disregards the trial court's exercise of discretion and substitutes the majority's decision for that of the trial court. See *DiCosola v. Bowman*, 342 Ill. App. 3d 530, 536 (2003) (in determining whether there has been an abuse of discretion, this court does not substitute its judgment for that of the trial court, or even determine whether the trial court exercised its discretion wisely).

¶ 151   The majority's decision dooms the triplets to the very fate the trial court, in its discretion, sought to prevent by fashioning the judgment so that the triplets' current and future needs would be met without the scenario of them having to obtain counsel and litigate for several more years their likely future expenses, including their postsecondary educations. Under the unusual facts of this case, the $4.5 million amount to fund the trusts was necessary to act in the best interests of the triplets, and I cannot say that it was an abuse of discretion.

¶ 152                                  II. Rule 137 Sanction

¶ 153   I dissent from the majority's decision to vacate the $50,000 Rule 137 sanction and remand the matter to the trial court with directions to consider only the pleadings, motions, or other documents for which a sanction might be imposed under the rule.

¶ 154   Harlow argued in part that no reasonable person would sanction him $50,000 on the theory that everything he filed violated Rule 137. However, it is not accurate to attribute the sanction award to the trial court's statement that all Harlow's attempts to defend or appeal were made in bad faith. In context, the trial court determined that sanctions were warranted here where Harlow had clearly been adjudicated the biological father of the triplets, he unquestionably owed them a duty of support, and his litigation efforts to delay and defeat that obligation and needlessly increase the cost of litigation were made in bad faith.

¶ 155   Regarding those litigation efforts, the court agreed with Wipaporn that the subpoena, affidavit, and 10 separate pleadings filed by Harlow and cited by Wipaporn in her 17-page motion for sanctions violated Rule 137. Wipaporn's motion referenced several instances of Rule 137 violations. For example, after the Illinois Appellate Court granted Harlow's motion to stay proceedings based on his pending appeal before the Supreme Court of Thailand, Harlow's counsel surreptitiously issued subpoenas to Facebook and Yahoo! without leave of the trial court and egregiously used the trial court's case number to do so. Wipaporn alleged that Harlow was attempting to misuse the trial court and its pending case to collect information for his invasion of privacy action in the United Kingdom. Also, Harlow's counsel submitted an affidavit contending, contrary to the record, that he had objected to the initial appointment of the children's representative and subsequent conversion of that representative to a GAL. In addition, Harlow served an inaccurate and misleading financial affidavit, violated an agreed protective order by attaching sensitive immigration documents to his pleadings, and objected to almost every document sought by Wipaporn during the discovery phase for even the most basic financial information.

¶ 156   Furthermore, counsel for Harlow accompanied him to file a false police report with the Chicago Police Department, alleging that Wipaporn and her counsel engaged in an elaborate scheme to defraud him by extortion, blackmail, and trickery. Harlow also reported these alleged crimes to the United States Department of State and reported the alleged loss on his 2016 income tax return, which was filed in this case. After the September 2018 judgment awarding child support and the November 2018 retroactive support award, Harlow, in a last-ditch effort to further delay enforcement of the trial court's orders, filed for bankruptcy, which Wipaporn and the children then sought through counsel to have dismissed. Harlow also sought to delay his legal obligations to the triplets by arguing that sperm donors cannot be held responsible for child support. In addition, Harlow and his wife engaged in a pattern of evasions and transparently fraudulent transactions to attempt to transfer assets that were formerly Harlow's nonmarital assets into some form of joint ownership with his wife. Harlow also changed his previously pled argument that the Support Act did not apply to currently assert that it did apply, filed oppositional pleadings to an originally agreed upon order to convert the child representative appointment to a GAL appointment, and filed for substitution of the judge for cause on the first day of trial.

¶ 157   The trial court recounted the harassment, unnecessary delay, and needless increase in the cost of litigation that resulted from Harlow's improper pleadings, motions, and other documents. Specifically, Wipaporn was forced to defend herself and her children; went into debt; lost her real estate, jewelry, and other personal property while attempting to receive justice for her children; and was forced to live on loans from her new husband's parents.

¶ 158   The record supports the trial court's ruling. Harlow, who is a very wealthy individual, spared no expense in this vexatious litigation. He refused to support the triplets before they were even one year old. They turned 14 years old in November 2022. During this protracted litigation,

the triplets often lacked basic insurance and medical and dental care and appropriate educational and recreational opportunities. Harlow's dilatory, evasive, litigious, and deplorable behavior is well documented in the record of these proceedings and the trial court's judgment.

¶ 159   The discretion of the trial court with regard to Rule 137 sanctions is "entitled to great weight." *In re Marriage of Schneider*, 298 Ill. App. 3d 103, 109 (1998). I would find that the trial court did not abuse its discretion by imposing the $50,000 Rule 137 sanction on Harlow.

¶ 160                              III. Immigration Expert Witness

¶ 161   I specially concur with the majority's ultimate conclusion that any error in barring the testimony of Harlow's immigration attorney expert witness Nassar was harmless; however, I do not agree with the majority's statement that there "is merit" to Harlow's argument that the trial court abused its discretion by barring Nassar's testimony.

¶ 162   Although petitioner's emergency motion mentioned that relief was sought on the additional basis to help the family avoid deportation and remain in the United Kingdom, the trial court made clear as the hearing date approached that it was *not* proceeding on the issue of creating an emergency fund to lessen the risk of the family's deportation. The court stated that the issue of deportation was not relevant to the court's determination of the petition to modify the Thailand child support judgment and the triplets' best interests. Over the course of the hearing, Harlow questioned the witnesses, over petitioner's objections, about the family's immigration status, but the trial court constantly informed the parties that the issue of whether the family would be deported from their home of several years in the United Kingdom was irrelevant and thus would not factor into the court's decision on the petition to modify the Thailand child support judgment.

¶ 163   I agree with the trial court's ruling barring Nassar's testimony because it was irrelevant. "[T]estimony grounded in guess, surmise, or conjecture, not being regarded as proof of a fact, is

irrelevant as it has no tendency to make the existence of a fact more or less probable." *Modelski v. Navistar International Transportation Corp.*, 302 Ill. App. 3d 879, 886 (1999) (citing *Dyback v. Weber*, 114 Ill. 2d 232, 244-45 (1986)). It was within the trial court's discretion to bar Nassar's opinion concerning deportation as irrelevant and focus instead on the relevant evidence concerning child support for the triplets based on their expenses and needs in the United Kingdom, which had been their home for several years. In offering Nassar's testimony, Harlow was asking the court to speculate about what an appropriate amount of modified child support would be if the family were living in Thailand. The trial court properly declined to do so and instead focused on the relevant evidence of the family's expenses based on them having lived in the United Kingdom for the past several years.

¶ 164   Instead of asking a trial court to speculate about how long children might reside in a particular locale, section 510(a) of the Marriage Act (750 ILCS 5/510(a)(1) (West 2016)) and section 802(f) of the Parentage Act (750 ILCS 46/802(f) (West 2016)) allow a party to petition the court to modify a child support award when a substantial change in circumstances has occurred. If Wipaporn and the triplets actually had been deported from the United Kingdom, that could constitute a showing of a substantial change in circumstances sufficient to support a future petition by Harlow to modify the court's child support order. However, instead of the court basing its modified support award upon the family's current actual living expenses in the United Kingdom, Harlow wants to skip over the step of showing that a substantial change in circumstances has occurred and argue that the family's child support award should incorporate the lower costs and standard of living in Thailand based on the possibility that the family might be deported to Thailand sometime in the future. I believe that the trial court did not abuse its discretion by barring Nassar's irrelevant testimony regarding the alleged imminence of Wipaporn's and the triplets' deportation.

¶ 165                                    IV. Child Support Credit

¶ 166   Finally, I make one point of clarification regarding Harlow's entitlement to a credit of $824,034 for prospective modified child support payments he allegedly made after entry of the September 2018 support judgment and before the section 503(g) trusts were funded with $4.5 million from his assets.

¶ 167   In her appellate brief, Wipaporn argues, in part, against awarding Harlow any credit because the requested amount was already spent when he asked for credit. Wipaporn, however, does not elaborate on what that money had been spent on. If the amount of Harlow's alleged credit was used to pay court-ordered attorney fees or other costs, then Harlow would not be entitled to any credit.

*In re Parentage of A.H.*, **2023 IL App (1st) 190572**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 11-D-6475; the Hon. Jeanne Cleveland Bernstein, Judge, presiding. |
| **Attorneys for Appellant:** | David F. Wentzel, of Wentzel Law Offices, and Michael G. DiDomenico and Sean M. Hamann, of Lake Toback DiDomenico, both of Chicago, for appellant. |
| **Attorneys for Appellee:** | Paul J. Bargiel, of Paul J. Bargiel, P.C., of Glen Ellyn, and Gemma B. Allen, of Allen & Glassman, Chtrd., of Chicago, for appellee. |